(No. 50363

*In re* KARL GEORGE LaPINSKA, Attorney, Respondent.

*Opinion filed October 6, 1978.*

462

RYAN, J., took no part.
WARD, C.J., and UNDERWOOD, J., specially concurring.

Philip Schickendanz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins, of Collins & Amos, of Chicago, for respondent.

MR. JUSTICE MORAN delivered the opinion of the court:

This action is brought by the Administrator of the Attorney Registration and Disciplinary Commission. Count I of the complaint alleged that respondent, Karl George LaPinska, accepted private employment which was in direct conflict with his public duties as attorney for the city of Princeton, and that he wilfully misused his official position to gain a favorable settlement of the private controversy. Counts II through V charged that respondent caused to be published various self-laudatory articles which appeared in a local newspaper.

A hearing panel of the Attorney Registration and Disciplinary Commission found respondent guilty of misconduct on each of the counts and recommended he be suspended for six months. The Review Board reversed the hearing panel's conclusion with respect to counts II through V, but confirmed the findings as to count I. Emphasizing respondent's flagrant misuse of public office, the Review Board recommended disbarment. Respondent excepts to the findings and recommendations which relate to count I, but admits that his conduct may warrant discipline. The Administrator does not dispute the reversal of counts II through V and, during oral argument, conceded that he does not seek discipline as severe as disbarment. Consequently, the only issue here considered is the appropriateness of the discipline which the Review Board imposed.

Respondent's own testimony revealed the following facts. Robert E. Bird, Sr., a builder and real estate broker in Princeton, constructed a speculative home on a lot (209 East La Salle Street) which he owned. The lot measured 80 by 140 feet. A 60-foot-wide home was positioned thereon

within 4 feet of the west lot line, in violation of a Princeton zoning ordinance which prohibited residences from being built closer than 10 feet from the side boundary of any lot. After construction and before selling the home, Bird, Sr., sold 10 feet along the east side of the lot to the adjacent lot owner. By doing so, he again violated the zoning ordinance.

On April 22, 1974, Bird, Sr., sold the residence to Thomas and Pauline Kutella for $33,500. At the time of sale (and at all times relevant to these proceedings) respondent was city attorney for Princeton and maintained a private practice. Respondent, as a member of the Illinois Attorneys Title Guarantee Fund, was engaged by Bird, Sr., to secure title papers on the lot. For these services, he billed Bird, Sr., in the sum of $152. The deed of sale, which was prepared by Bird, Sr.'s son, Donald Bird, an attorney, accurately described the lot as being 70 feet in width.

At a meeting of the Princeton city council in August 1974, the Kutellas, apparently irate because they had unknowingly purchased a 70-foot rather than an 80-foot lot, demanded that Bird, Sr., be charged with a quasi-criminal violation of the zoning ordinance. Respondent, in his capacity as city attorney, informed the Kutellas that they should stop by his office to sign a formal complaint. Such complaint was subsequently served on Bird, Sr., on or about August 12, 1974. No prior quasi-criminal charges had been filed against Bird, Sr. No charge was filed against the Kutellas, even though, according to the ordinance, both the person who created the violating condition and the present owner of the premises could be liable.

At the hearing on August 19, 1974, respondent appeared on behalf of the city; Donald Bird represented his father. Respondent recommended the minimum fine and apprised the court that the city had no further interest in the matter. Pursuant to this understanding, Robert Bird,

Sr., pleaded guilty and was fined $10 and $5 in court costs.

Three days later, Thomas Kutella came to respondent's office and complained of the lenient treatment which Bird, Sr., had received. Kutella informed respondent that he was aware that the ordinance provided for a continuing violation and demanded that prosecution be pursued. Respondent suggested that Kutella appear at the next city council meeting to make his position known. After further discussion that day, Kutella and respondent entered into a retainer agreement whereby respondent would represent the Kutellas in a civil action against Bird, Sr., for breach of contract and fraud arising out of the sale of the property. The agreement provided that respondent would receive a contingent fee only from any recovery in excess of the cost of the property with improvements (approximately $43,500). The fee arrangement was for 25% over $43,500 if settled before filing suit, 33 1/3% if settled after suit was filed, and 40% if a second trial or appeal became necessary.

At the next city council meeting, Kutella stated that he wished to sign daily ordinance violation complaints against Bird, Sr. Respondent, who was present at the meeting and who would be responsible for prosecuting the quasi-criminal charges, did not inform the city officials that he also represented the Kutellas privately in the same matter.

The first of the continuing-violation complaints was prepared on the same day and served on Bird, Sr., on September 4, 1974. While respondent was representing the Kutellas in the private matter, he caused over 30 such complaints to be served on Bird, Sr. On September 5, 1974, when Bird, Sr., received the second such complaint, his son, Donald Bird, telephoned respondent and inquired why the plea agreement and payment of the fine plus costs had not disposed of the entire controversy. Respondent told Bird that the city had no further interest in the

matter, but that Kutella continued to file complaints. Bird suggested at that time that respondent might have a conflict of interest, but respondent failed to acknowledge any possible conflict.

Respondent and Bird next conferred at Bird's law office on September 19, the evening before the return date on the first of the continuing-violation complaints. Bird mentioned his father's willingness to buy back the property from Kutella. Respondent stated that he did not think Kutella would agree to sell the property and that Kutella wanted the 10 feet to which he felt entitled. The next morning, at the courthouse, Bird again informed respondent of his father's readiness to settle. Bird, representing his father, pleaded not guilty to the ordinance violation.

Respondent received authorization from the Kutellas to settle for between $63,500 and $68,500. On September 23, respondent met with Bird and his father in Bird's law office. When respondent offered to settle for $68,500 (more than double the purchase price) Bird, Sr., walked out of the meeting. To document what had transpired, Bird, after his father had left the meeting, prepared a memorandum which was signed and initialed by both Bird and respondent. The memorandum recorded that the civil dispute could be settled for $63,500 provided that Kutella would sign a release of all civil actions and quasi-criminal complaints and respondent would recommend to the city of Princeton that a variance or occupancy permit be granted for the property. (A $63,500 settlement would net respondent $5,000 pursuant to his contingent-fee agreement with Kutella.)

Twice during the following week, respondent wrote to Bird using the stationery of the city attorney of Princeton. The letters informed Bird that "in the event of a settlement with Mr. Kutella," the city would issue an occupancy permit and would entertain no further complaints against Bird's father in connection with the zoning

violations. Respondent also prepared a document which purported to absolve him of liability for representing both the Kutellas and the city. The release, which was to be signed by the Birds, stated that respondent "in no way used or threatened the use of his position as attorney for the City of Princeton in effecting a settlement [of the civil claim]" and that the Birds did not object to the dual representation. The release was never signed by the Birds.

In a letter to respondent dated October 2, 1974, Bird rejected the settlement offer of $63,500 and terminated negotiations. On October 8, 1974, Bird filed a motion in the circuit court of Bureau County. The motion sought to withdraw his father's original guilty plea, to dismiss for governmental misconduct the quasi-criminal charge, and to suspend respondent from the practice of law in ordinance-violation cases. Upon receiving this motion, respondent withdrew from representing the city in such cases and withdrew as attorney for the Kutellas. (After respondent withdrew from the case, the civil dispute was settled by Bird, Sr., purchasing the home from the Kutellas for $41,000.)

Donald Bird testified before the hearing panel that he had, on two occasions, informed respondent of the conflict of interest. He agrees with respondent that the first occasion was during their telephone conversation on September 5, 1974, at which time he asked whether respondent was representing the Kutellas in a private capacity. When respondent indicated that he was considering doing so, Bird suggested that such action would be a breach of professional ethics in light of the fact that respondent had been employed and paid by Bird's father in connection with the very same real estate transaction. (By the date of this telephone conversation, respondent had already entered into the retainer agreement with Kutella.)

Bird stated that he again objected to respondent's

conflict of interest during their meeting in Bird's law office on September 19. When respondent told Bird that he was considering representing the Kutellas in a fraud action against Bird's father, Bird advised respondent that an attorney was prohibited from undertaking private representation in connection with a matter which had come to his attention through his public office. Bird testified that, at that point, he decided to document the extent of respondent's dual representation and the extent to which respondent would use his office as city attorney for the benefit of a private client. All of Bird's subsequent negotiations with respondent were directed exclusively toward documenting respondent's abuse of office.

Respondent has maintained, both before the hearing panel and in this court, that he believed that representation of both the Kutellas and the city of Princeton created no inherent conflict. He maintains that his actions on behalf of the Kutellas and the city had a congruent purpose—to enforce the ordinance. We find respondent's position unsupportable both in the law and on the facts.

A congruence of purpose in the representation of multiple parties may not avert conflicts of interest. A conflict of interest arises whenever an attorney's independent judgment on behalf of a client may be affected by a loyalty to another party. "[The rule against representing conflicting interests] is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties. He should undertake no adverse employment, no matter how honest may be his motives and intentions." (*People v. Gerold* (1914), 265 Ill. 448, 477.) Moreover, an attorney who represents the public must be particularly wary of potential conflicts because he is measured not only by the honesty of his intentions and motives, but by the suspicion with which

his acts may be viewed by the public. " 'A public officer owes an undivided duty to the public whom he serves, and is not permitted to place himself in a position which will subject him to conflicting duties or expose him to the temptation of acting in any manner other than in the best interests of the public.' " (*In re Becker* (1959), 16 Ill. 2d 488, 494, quoting 43 Am. Jur. *Public Officers* sec. 266, at 81 (1942).) Therefore, we look not toward the congruence of interests, but toward the potential for diverging interests.

The serious impropriety of an attorney accepting private employment with respect to matters in which he has substantial responsibility as a public official is well established. (See Annot., 17 A.L.R.3d 835, 850-54 (1968); H. Drinker, Legal Ethics 118-20, 130-31 (1953); Illinois Code of Professional Responsibility, Disciplinary Rule 8–101(A)(5) (1970).) In *In re Truder* (1932), 37 N.M. 69, 17 P.2d 951, a district attorney accepted private employment from the administrator of the estate of a person who had died in an auto accident. At the same time, the attorney was prosecuting the criminal action for voluntary manslaughter which arose out of the same auto accident. Although the attorney was charged with professional misconduct only for offering to dismiss and for dismissing the criminal prosecution upon the settlement of the civil action, the court felt an "imperative duty to condemn" the mere practice of representing such conflicting interests. It stated:

"The incompatibility of public duty and private interest and employment is too plainly illustrated in this case to require discussion. It scarcely aggravates the case to show that one of the respondents actually uttered the suggestion which is implied in the situation itself, that a payment of damages would moderate the vigor or good faith, if not entirely end, the prosecution."

*In re Truder* (1932), 37 N.M. 69, 71, 17 P.2d 951, 952.

Respondent offers in mitigation that, in spite of his misguided representation of conflicting interests, he acted openly and all the affected parties were aware of his dual representation. One inference from respondent's position is that if a potential conflict is fully disclosed to all affected parties, the parties may consent to such representation. "But this escape hatch is not available to an attorney representing a municipality and a private client." (*In re A* (1965), 44 N.J. 331, 335, 209 A.2d 101, 104, 17 A.L.R.3d 827, 832 (concurrence).) An attorney may not represent both a governmental body and a private client even if disclosure is made and the parties agree to such dual representation. " '*** Where the public interest is involved, disclosure alone is not sufficient since the attorney may not represent conflicting interests even with the consent of all concerned.' " (*In re A* (1965), 44 N.J. 331, 334, 209 A.2d 101, 103, 17 A.L.R.3d 827, 831. Also, H. Drinker, Legal Ethics 120 (1953).) This court has noted that while disclosure would make representation no more ethical, failure to fully disclose would create temptation and foster public suspicion. See *In re Becker* (1959), 16 Ill. 2d 488, 498.

The record discloses that, contrary to respondent's characterization, he did not act openly and did not fully disclose the extent of his dual representation. Under cross-examination by counsel for the Administrator, respondent admitted that, during the city council meeting at which the matter of prosecuting Robert Bird, Sr., for a continuing violation was discussed, he did not disclose his private employment by the Kutellas. Indeed, at no time during the negotiations between respondent and the Birds was the city council ever apprised of respondent's representation of the Kutellas. Respondent testified that the mayor was aware of such representation, but there is no

indication that the mayor knew that respondent hoped to dismiss the quasi-criminal charges in exchange for a settlement of the civil dispute or that respondent's personal gain, by virtue of the contingent-fee agreement, depended not upon bringing the property into compliance with the ordinance but upon gaining a substantial monetary recovery for the Kutellas.

Respondent maintains that he did not become aware of the conflict of interest until late in the negotiations. Even if we disregard Bird's testimony that he twice objected to respondent's conflict of interests, it is obvious that respondent was aware of and concerned about the impropriety of his dual representation when he drafted the release which sought to absolve him of any misfeasance associated with such representation. At that point, however, he chose to insulate himself from culpability rather than to withdraw from the case. Respondent did not, in fact, withdraw until after Bird filed a motion in circuit court accusing him of governmental misconduct.

The evidence establishes quite clearly that respondent's misconduct did not end with his misguided representation of conflicting interests. We find, as did the Review Board, that respondent intentionally used the leverage and power of his position as city attorney to secure personal gain and a favorable settlement in behalf of a private client. Respondent testified that he saw no conflict inasmuch as, in his official capacity, he could not prevent the issuance of complaints against Bird, Sr. Yet, when it served the interest of negotiations in the civil dispute, respondent's position did allow him to suspend the charges for a two-week period. Respondent also took the opportunity, in his official capacity, to assure Bird that the city would entertain no complaints against Bird's father "in the event of a settlement with Mr. Kutella." Such overt representations, in addition to the very implications of respondent's official position, could not help but convey

to Bird that quasi-criminal charges would continue until settlement of the civil claim was reached.

In arriving at the appropriate discipline to be imposed in this case, we must appraise respondent's conduct in reference to the underlying purposes of our disciplinary process, which purposes are to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public. (See, e.g., *In re Sherre* (1977), 68 Ill. 2d 56, 62; *In re Smith* (1976), 63 Ill. 2d 250, 256; *In re Di Bella* (1974), 58 Ill. 2d 5, 8; *In re Gartland* (1970), 47 Ill. 2d 177, 183.) As we have already stated, dual representation is particularly troublesome where one of the clients is a governmental body. In such circumstances, a conflict of interest not only generally undermines the public's confidence in its officials, but directly and immediately prejudices the particular public interest at stake. We must further recognize that, in aggravation of this breach of public trust, respondent used his official position as leverage in an attempt to gain an advantage in the settlement of a civil dispute.

On the basis of these factors, it is our considered judgment that respondent should be suspended from the practice of law for a period of one year.

*Respondent suspended.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE WARD, specially concurring:

I concur in the judgment of the majority that the respondent should be suspended, but I consider that the sanction imposed is not appropriate to serve the ends of the disciplinary process. This court has said that the first purpose of a disciplinary proceeding against a member of the bar is to safeguard the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach. Unwarranted lenity can be as

injurious to the public interest and to the integrity of the profession as unwarranted severity. Considering the grave professional misconduct here I believe the suspension should have been for a period of not less than 3 years. Imposing sanctions is a melancholy business, but presiding over the professional disciplinary system is one of this court's most important responsibilities.

MR. JUSTICE UNDERWOOD joins in this special concurrence.