(No. 57167.—

*In re* PAUL HARVEY SCHNEIDER, Attorney,
Respondent.

*Opinion filed September 23, 1983.—Rehearing
denied December 2, 1983.*

Mary M. Conrad, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Paul Harvey Schneider, of Chicago, *pro se.*

JUSTICE MORAN delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a three-count complaint before the Commission charging respondent, Paul Schneider, with professional misconduct. Count I alleged that respondent represented clients with conflicting interests in a criminal case, and counseled certain clients to provide false information to the prosecuting attorney. Counts II and III charged him with neglect in handling legal matters entrusted to him. The Hearing Board found respondent guilty of all three counts and recommended that he be suspended from the practice of law for a period of three years, and until further order of

the court. Both the Administrator and respondent filed exceptions with the Review Board, which adopted the findings of the Hearing Board but recommended that respondent be disbarred.

Two issues are raised on appeal: (1) Were the allegations contained in count I proved by clear and convincing evidence? (2) Is disbarment an appropriate sanction under the circumstances of this case?

The facts relevant to count I are as follows. On October 31, 1978, John Harvey, Alan Sherman and David Berta (defendants) were arrested in Milwaukee, Wisconsin, and charged with forgery in connection with a "check-kiting" scheme. Subsequent to their arrest they telephoned Joseph Kordan, who was responsible for planning, and providing the necessary funds for, the operation. Kordan then contacted respondent and requested that he investigate the nature of the charges pending against the men and the amount of their bail. Respondent interviewed Harvey and Sherman in jail that same evening and later reported the substance of that conversation to Kordan.

The following day respondent contacted Robert Lerner, a lawyer practicing criminal law in Milwaukee. Pursuant to their conversation, Lerner agreed to represent the defendants. Between November 1 and November 7, 1978, respondent and Lerner had numerous telephone conversations concerning the pending charges and strategies for bond reduction. Respondent also had frequent discussions with Kordan, during which he became apprised of Kordan's participation in the scheme.

On November 7, respondent met with Lerner at Lerner's office in Wisconsin. The purpose of the meeting was to discuss the status of the case and to visit the defendants in jail. Respondent also paid Lerner a $1,000 retainer fee which he received from Kordan. The events

which transpired during the meeting, and the subsequent discussions at the jail, are in dispute.

Lerner, who testified for the Administrator before the Hearing Board, stated he informed respondent the defendants were in substantial jeopardy and the evidence against them was overwhelming. However, the prosecuting attorney was willing to negotiate if they would reveal the identity of the "mastermind" behind the scheme. Respondent then inquired as to "what would happen" if the defendants informed the prosecuting attorney that Richard Bernowski, who was deceased, planned the operation. Lerner replied that he did not believe Bernowski was involved, and he would not counsel his clients to lie to the authorities. He further testified that respondent indicated he was aware Bernowski was not involved in the offense. Subsequent to their meeting, Lerner stated that he and respondent spoke with the defendants at the jail. Respondent "suggested" to each of them that they inform the prosecuting attorney Bernowski planned the scheme.

Respondent testified for the Administrator as an adverse witness. He stated that he did not apprise Lerner of Kordan's involvement in the offense because Kordan did not want his identity disclosed. He further stated that Kordan paid him $1,000 in legal fees, and that he considered himself the attorney for defendants and Kordan until sometime subsequent to November 7, 1978. Respondent admitted that he mentioned Bernowski's name to the defendants, but stated he believed that he actually was involved in the offense.

Harvey and Sherman also testified for the Administrator. Harvey stated that Kordan planned the operation, but that respondent suggested they say Bernowski was responsible so as to "take the heat off." Harvey also indicated that respondent was aware of the opera-

tion prior to the defendants' arrests. According to the witness, he contacted respondent several weeks prior to the commission of the offense. Harvey stated that he informed respondent he was reconsidering participating in the scheme. Respondent informed him that "everything was all right [and] to go ahead" with the operation. During cross-examination, Harvey indicated that Kordan and Bernowski participated in a similar scheme in the past, and that Bernowski may have been involved in the current operation. He further stated that he considered respondent as his attorney.

Sherman's testimony essentially corroborated Harvey's. On cross-examination, he stated that he has been convicted of six criminal offenses.

Respondent testified on his own behalf. He related that his law practice was primarily limited to traffic court, and that he had not previously represented a defendant in a felony case. He further stated that he only represented the defendants in the instant case as an "investigative attorney." His sole obligations were to determine the nature of the charges and to retain counsel for the defendants.

Respondent also indicated that Kordan told him Bernowski was involved in the scheme. He testified he never suggested that the defendants lie to the authorities; rather, he merely informed them that Bernowski died and they no longer needed to "protect" him.

Three character witnesses testified for respondent and stated that he had a good reputation in the community for honesty and integrity. A number of affidavits attesting to respondent's good character were also introduced into evidence.

The parties stipulated to the facts involved in counts II and III. Count II alleged that respondent was retained to defend Sam Beckerman in a contract suit. He filed an

appearance on behalf of his client but failed to take any further action. A default judgment was entered against Beckerman, who then requested that respondent vacate the judgment. When he failed to do so, Beckerman retained a new attorney but was unable to vacate the default judgment. As a result of respondent's conduct, Beckerman was damaged in the amount of $5,000.

Count III involved similar circumstances. Katherine Petrak retained respondent to defend her in a real estate action. He filed an appearance, but failed to take any further action until a default judgment was entered against her. Although respondent filed a motion to vacate the judgment, he failed to appear and argue the motion. Petrak subsequently retained a new attorney who was unable to vacate the default judgment. Respondent's conduct resulted in damage to his client in the amount of $3,300.

Respondent contends that the allegation he counseled defendants to lie to the authorities was not proved by clear and convincing evidence, because the witnesses who testified against him were not credible. He points out that Harvey and Sherman are convicted felons, and asserts that Lerner was "bitter" because he did not receive from respondent the balance of his legal fee.

It is well settled that the Hearing Board "is in the best position to weigh conflicting testimony and to make determinations regarding the credibility of witnesses." (*In re Harris* (1982), 93 Ill. 2d 285, 295, citing *In re Howard* (1977), 69 Ill. 2d 343, 351; *In re Smith* (1976), 63 Ill. 2d 250, 255; *In re Bossov* (1975), 60 Ill. 2d 439, 441, *cert. denied* (1975), 423 U.S. 928, 46 L. Ed. 2d 256, 96 S. Ct. 275.) Here, the Hearing Board was aware of Harvey's and Sherman's dubious backgrounds but chose to believe, with one exception noted below, their version of the events which transpired. Their testimony was cor-

roborated in large part by Lerner, whose reputation was unimpeached. The dispute between respondent and Lerner over the final fee, manifested in a letter respondent attached to his brief, was not made part of the record below; therefore, it will not be considered.

Respondent further alleges that the Hearing Board's decision was improperly influenced by evidence that respondent participated in the forgery scheme, an offense for which he was not charged. We agree that Harvey's testimony indicated respondent may have known about the scheme in advance and aided defendants in the commission of the offense. However, the Hearing Board expressly stated in its report that it disbelieved this portion of the testimony. We therefore fail to perceive how the evidence would have improperly influenced the Hearing Board's decision regarding the misconduct charged.

Respondent next contends that the Hearing Board erred in holding that he labored under a conflict of interest. He argues that he did not undertake to represent the defendants, but merely ascertained the charges against them and retained counsel for them. However, it is customary for an out-of-State attorney to employ local counsel who is more familiar with the State law involved. Further, according to respondent's own testimony, he acted as an "investigative" attorney for defendants from the date of their arrest until sometime after November 7, 1978, the date upon which the alleged conflict of interest arose. Harvey and Sherman testified that they considered respondent as their attorney. He met with the defendants and frequently conversed with them, attempted to obtain reduction of their bond, and worked closely with Lerner in determining how to proceed with the case. Under these facts, the Hearing Board could properly conclude that respondent acted as attorney for the defendants. Although he stated that he

never intended to "formally" represent the defendants at trial, legal representation encompasses more than litigation-related services. See *People ex rel. Chicago Bar Association v. Barasch* (1961), 21 Ill. 2d 407; *People ex rel. Chicago Bar Association v. Tinkoff* (1948), 399 Ill. 282.

Respondent does not dispute that he also acted as Kordan's attorney. The conflict of interest resulting from such multiple representation is obvious. On November 7, 1978, respondent was aware that Kordan planned the scheme. On that date, Lerner informed him that it would benefit defendants if they advised the prosecuting attorney as to who was responsible for the operation. It was therefore in the defendants' best interests to disclose Kordan's identity, and respondent was obligated to at least apprise them of this alternative. However, because of his duty to Kordan, respondent could not very well counsel defendants to reveal Kordan as the individual responsible for the scheme. Respondent therefore placed himself in the dilemma of having to choose between conflicting duties, the precise situation which the rule against representing conflicting interests is designed to prevent. See *In re LaPinska* (1978), 72 Ill. 2d 461.

Because the charges contained in count I were supported by clear and convincing evidence, and the parties stipulated to the facts involved in counts II and III, we turn to the question of what sanction should be imposed. We have not been referred to, nor does our research reveal, any cases involving facts analogous to those in the instant case. However, because of the egregious misconduct in which the respondent engaged, we feel constrained to adopt the Review Board's recommendation that he be disbarred.

In counseling his clients to falsify information to the prosecuting attorney, respondent engaged in conduct

which he knew to be fraudulent and deceitful and which hampers the administration of justice. Intentional dishonest behavior has never before been countenanced; nor will it be now. Our cases have indicated that disbarment is warranted where an attorney's conduct constitutes intentional fraud, as opposed to a mistaken judgment or lack of care. (See, *e.g., In re Snitoff* (1972), 53 Ill. 2d 50 (conversion of a client's funds); *In re Hopper* (1981), 85 Ill. 2d 318 (*dicta*); *In re Saladino* (1978), 71 Ill. 2d 263 (*dicta*).) Although respondent's behavior did not involve the typical forms of fraud, such as conversion, it was equally detrimental to his clients' interests.

Respondent's misconduct is exacerbated by the fact that he also undertook to represent clients with conflicting interests. The undivided loyalty to which they were entitled was thereby compromised, potentially placing respondent in the position of sacrificing certain clients for the benefit of another. Adverse employment has been proscribed under all circumstances (see *In re LaPinska* (1978), 72 Ill. 2d 461), and this principle can have no greater force than where a client's liberty may be at stake.

This court has recently stated that "more severe discipline is appropriate to deter neglect in criminal cases than in civil cases." (*In re Hall* (1983), 95 Ill. 2d 371, 375.) Certainly, then, the sanction should be even greater where a respondent engages in intentional misconduct which could harm a client. Indeed, the Review Board unanimously determined that the above-related conduct, standing alone, was sufficient to justify the sanction of disbarment. We agree. However, here the respondent engaged in further inappropriate behavior.

By his own admission, respondent neglected legal matters entrusted to him, with the result that his clients suffered over $8,000 worth of damages. He urges, how-

ever, a number of factors which he claims mitigate the misconduct involved in counts II and III. He points out that he plans to make restitution to his clients for the losses incurred as a result of his neglect; that he was experiencing domestic difficulties during the time the cases were pending; that the causes involved in counts II and III were the only nontraffic matters he has handled; and that he did not accept a legal fee for representing Petrak.

Respondent did not attempt to compensate his clients for their losses until after the instant complaint was filed. Further, it has been held that restitution will not excuse improper conduct. (*In re Feldman* (1982), 89 Ill. 2d 7; *In re Sherman* (1975), 60 Ill. 2d 590.) Nor should domestic difficulties absolve an attorney of his wrongdoing. (*Cf. In re Smith* (1976), 63 Ill. 2d 250 (severe financial and emotional problems will not excuse respondent's misconduct in converting a client's funds).) With regard to the fact that respondent did not accept a legal fee from Petrak, we agree with the Hearing Board's statement that "[a] lawyer's duty to his client is not measured by the existence or amount of his fee."

" 'The traditionally high standards of the legal profession impose upon [respondent] the duty to represent a client with zeal and diligence ***.'" (*In re Levin* (1979), 77 Ill. 2d 205, 210, quoting *In re Chapman* (1978), 69 Ill. 2d 494, 501.) This, in counts II and III, he has failed to do. It has been repeatedly held that negligence alone warrants the sanction of suspension. (See, *e.g., In re Hall* (1983), 95 Ill. 2d 371; *In re Levin* (1979), 77 Ill. 2d 205; *In re Chapman* (1978), 69 Ill. 2d 494; *In re Taylor* (1977), 66 Ill. 2d 567.) When coupled with respondent's more egregious misconduct involved in count I, disbarment is required in order to maintain the integrity of the legal profession and protect the administration of justice.

See *In re Smith* (1976), 63 Ill. 2d 250.

Accordingly, it is ordered that respondent be disbarred from the practice of law.

*Respondent disbarred.*