ROSS E. McNEIL *et al.*, Plaintiffs-Appellants, v. MILORAD P. KETCHENS *et al.*, Defendants-Appellees.—ROSS E. McNEIL *et al.*, Plaintiffs-Appellees, v. MILORAD P. KETCHENS *et al.*, Defendants-Appellants (Richard J. Whitney, Counsel-Appellant).—ROSS E. McNEIL *et al.*, Plaintiffs-Appellants, v. MILORAD P. KETCHENS *et al.*, Defendants-Appellees.

Fourth District Nos. 4—09—0388, 4—09—0393, 4—09—0617 cons.

Opinion filed January 6, 2010.

Frederic M. Grosser (argued), of Champaign, for Ross E. McNeil and Leslie K. McNeil.

Richard J. Whitney (argued), of Speir & Whitney, of Carbondale, for Milorad P. Ketchens *et al.*

Richard J. Whitney, of Speir & Whitney, of Carbondale, appellant *pro se.*

JUSTICE APPLETON delivered the opinion of the court:

We have consolidated three appeals, case Nos. 4—09—0388, 4—09—0617, and 4—09—0393. In all three appeals, the plaintiffs are Ross E. McNeil and Leslie K. McNeil, husband and wife, and the defendant is Milorad P. Ketchens, together with all unknown owners and nonrecord claimants. This litigation arose from an incident on January 4, 1998, in which Ketchens blockaded the McNeils' driveway—or what the McNeils had always assumed was their driveway. Leslie McNeil came home in the evening to 609 West Stoughton Street in Urbana and found that Ketchens had parked his car in the driveway next to her and her husband's house. Further, he was putting a cover on the car as if he intended to leave the car there for a while. The McNeils asked him to leave, and he refused. He invited the McNeils to sue him.

So, the McNeils sued Ketchens. Count I of their amended complaint seeks a declaratory judgment that Ketchens does not own the driveway (we say "the driveway," but, as we will explain, the land in dispute actually consists of about half the total area of the driveway—or the original driveway; we will make these fine distinctions later). Count II seeks to quiet title by adjudging the McNeils to be the owners of the driveway by virtue of their purchase of 609 West Stoughton Street. Count III seeks a judgment that the McNeils have acquired the driveway by adverse possession. At the conclusion of a bench trial, the trial court found in favor of Ketchens and against the McNeils, denying them relief on all three counts of their amended complaint. In case Nos. 4—09—0388 and 4—09—0617, the McNeils appeal from the unfavorable decision in the bench trial. (The two case numbers correspond to the two notices of appeal the McNeils filed, one on May 22, 2009, and the other on August 17, 2009. The second notice of appeal was, as the notice says, a "protective notice of appeal" in the event that Ketchens's motion for costs, filed on May 21, 2009, qualified as a posttrial motion.)

In case Nos. 4—09—0388 and 4—09—0617, we agree with the trial court's judgment on count II because the legal description in the deed to the McNeils does not include the disputed piece of land. Nevertheless, we hold that the court erred in finding against the McNeils on their claim of adverse possession in count III. The court rejected that claim for two reasons, neither of which stands up to

scrutiny. First, the court found the testimony of a previous owner of 609 West Stoughton Street, Gilbert P. Haight, Jr., to be "vague and indefinite." Regardless, however, of any vagueness or indefiniteness in Haight's testimony, it is a definite and incontrovertible fact that since 1937, a house and garage have stood on 609 West Stoughton Street and a driveway has led straight from the street to the garage, running alongside the house. Ketchens does not dispute that fact in his brief. Nor does he suggest that the driveway disappeared and reappeared. It also is a definite and incontrovertible fact that for more than 20 years before the commencement of this lawsuit, the house—and therefore the driveway running alongside the house and leading to the garage—never was abandoned.

A misguided notion of abandonment seems to lie behind the trial court's second reason for rejecting the McNeils' claim of adverse possession. The court held that when Haight and his wife bought a new house and moved out of 609 West Stoughton Street, leaving it vacant for approximately one month until the new owners moved in, the one-month vacancy constituted a break in the continuity of possession. That holding is erroneous as a matter of law. The Haights did not abandon the property by moving out of it and putting it up for sale, and such temporary periods of vacancy incident to the sale of the property, between the previous owner moving out and the new owner moving in, do not interrupt the adverse possession. Therefore, in case Nos. 4—09—0388 and 4—09—0617, we affirm the trial court's judgment in part and reverse it in part: we affirm the judgment on count II and reverse it on counts I and III.

The appellants in the remaining appeal, case No. 4—09—0393, are Ketchens and one of his attorneys, Richard J. Whitney. They appeal from an award of sanctions against them and in favor of the McNeils in the amount of $20,500 pursuant to Illinois Supreme Court Rule 137 (155 Ill. 2d R. 137). We do not find the sanctions to be an abuse of discretion. Therefore, we affirm the trial court's judgment in case No. 4—09—0393.

## I. BACKGROUND

### A. The Bench Trial

#### 1. *The Conveyances of Tract A*

The bench trial occurred in August 2008, and the evidence tended to show the following facts. On February 29, 1988, the McNeils bought the house at 609 West Stoughton Street in Urbana from Gary Turner and Geraldine Condomitti-Turner. According to the warranty deed, the legal description of the property is as follows:

"Lot 4 of a Subdivision of Lot 35 of a Subdivision of the Southwest Quarter of the Southwest Quarter of Section 8, Township 19 North, Range 9 East of the Third Principal Meridian

AND

The North 47.75 feet of Lot 3 Block 10 of Joseph W. Sim Jr.'s Addition to Urbana, Illinois[,] for Springfield Avenue, in Champaign County, Illinois."

Thus, 609 West Stoughton Street, so described, consists of lot 4 plus the northern part of lot 3.

At the time the McNeils bought this land, it was improved with a house, a driveway, and a small detached garage. The house faced West Stoughton Street to the north. The garage stood behind the house and off to the side, diagonal to the southwest corner of the house. A gravel driveway extended from West Stoughton Street in a straight line to the garage, skirting the west side of the house.

The McNeils still live in the house, but the old garage no longer exists. In 1990 and 1991, they built a new, larger garage elsewhere in the yard, and when they finished the new garage, they tore down the old one. The driveway still exists, however, although the McNeils have shortened it somewhat. The driveway now ends at some ornamental landscaping that extends in an arc from the west side of the house. The McNeils still park their vehicles in the front 20 or 25 feet of the driveway.

In January 1995, a boundary survey brought to light an ambiguity regarding this driveway, a problem in the McNeils' chain of title. A firm of engineers and surveyors, Berns, Clancy and Associates, P.C., performed the survey at the behest of the Urbana Park District, and the survey included the 500 and 600 blocks of West Stoughton Street. The survey discovered a narrow wedge of land between lots 4 and 5 that did not seem to belong to either lot. Lot 4 was the McNeil residence, 609 West Stoughton Street. Lot 5 was 611 West Stoughton Street, next door to the west. The parties call this wedge of land between lots 4 and 5 "Tract A." The thick part of the wedge, the part the imaginary hammer would hit, is 13.11 feet wide and abuts West Stoughton Street, taking up the full width of the driveway where the driveway connects with the street. The wedge extends south 85 feet along the east boundary of lot 5, narrowing to a point. In all, Tract A takes up about half the total area of the original driveway, and it takes up all the driveway near the street.

A man named Frank A. Somers carved Tract A from lot 5 on September 16, 1905, giving this thin triangle of land to his sister, Mattie J. Somers, to whom he had previously given lot 4 and the north 47.75 feet of lot 3, on June 29, 1903. The purpose was to equalize the

frontages of lots 4, 5, and 6. These lots stand side by side, east to west, on West Stoughton Street, and, originally, lot 6 had a frontage of 69 feet, lot 5 a frontage of 58.05 feet, and lot 4 a frontage of 43.89 feet. Frank also owned lot 6, and in addition to carving Tract A off of lot 5 and adding it to lot 4, he carved a similar wedge off of lot 6 and added it to lot 5. The frontages of the three lots thereby were equalized to about 57 feet apiece. According to Frank's deed of September 16, 1905, to Mattie, the legal description of Tract A is as follows:

"Commencing at the North East corner of Lot Two (2) Block Ten (10) of J.W. Sim's Jr. addition to Urbana, running thence in a Northerly direction parallel with the East line of Lot Five (5) of a subdivision of lot Thirty-five (35) of a subdivision of the South West Quarter of the south West Quarter of Section Eight (8) Township Nineteen (19) North Range Nine (9) East 3rd P.M. thence North 84.7 feet to the North East corner of Lot Five (5) of said subdivision thence running in a Westerly direction 13.11 feet parallel with the North line of Lot Five (5) of said subdivision thence South to the point of beginning."

Mattie remained the owner of lot 4, the north part of lot 3, and Tract A until she died on September 27, 1955.

At her death, Mattie J. Somers was known as Mattie J. Starkey because in 1908, she married Alva D. Starkey, who predeceased her. Actually, Mattie's first name was Martha, although her brother referred to her as Mattie in the deeds. She referred to herself, more formally, as Martha J. Starkey in her will, dated July 9, 1948, and in her codicil, dated March 10, 1952.

The fifth clause of her will begins, "I give and devise all my real estate as follows," and then it lists six items of real estate in subclauses (a) through (f), naming the devisee or devisees for each item. Subclause (e) reads as follows: "I desire my nieces Helen Somers and Mary Somers Richards to take the residence property located at 609 West Stoughton Street in the City of Urbana, Illinois, and described as Lot 4 of a Subdivision of Lot 35, and the North 47.75 feet of Lot 3 in Block 10, all in J.W. Sims Jr. Addition to the City of Urbana, in equal portions, share and share alike." The rest of subclause (e) stipulates that Mary's share of this property shall go to Mattie's nephew Harry K. Somers in trust for Mary. Subclause (e) does not mention Tract A, however. Nor is Tract A mentioned anywhere else in Mattie's will or in her codicil, either. Further, the will and codicil contain no residuary clause for real estate.

Subsequent conveyances of 609 West Stoughton Street repeat the legal description in clause 5(e) of the will, describing lot 4 and the northern part of lot 3 but not Tract A. On November 13, 1972, Mat-

tie's nieces Helen Somers and Mary Somers Richards conveyed the property to Gilbert P. Haight, Jr., and Shirley Haight, describing it as follows: "Lot 4 of a Subdivision of Lot 35, and the North 47.75 feet of Lot 3 in Block 10, all in J.W. Sims Jr. Addition to the City of Urbana." (Although Mattie had given Mary her half share of 609 West Stoughton Street in trust, the Champaign County circuit court invalidated the trust on June 5, 1956, declaring Mary to be an owner of 609 West Stoughton Street in fee simple.) Similarly, on February 25, 1983, the Haights conveyed to Turner and Condomitti-Turner lot 4 and the north 47.75 feet of lot 3. In like manner, on February 29, 1988, Turner and Condomitti-Turner conveyed to the McNeils lot 4 and the north 47.75 feet of lot 3. Thus, from Mattie's will through three successive conveyances, Tract A is unspecified.

Apparently for the first time in some 90 years, Berns, Clancy and Associates, P.C., in its 1995 survey, pointed out the distinction between lot 4 and Tract A. The survey gave Ketchens an idea: here was this little piece of land that was in limbo, so to speak, and he wanted to become its owner. The question naturally arises, Why did Ketchens want this little pie-sliver of land? Evidently, he wanted to trade it for another piece of land. Ketchens owns the house at 613 West Stoughton Street (lot 6), two doors west of the McNeils, and according to Carl Burkybile, who lives at 611 West Stoughton Street (lot 5), between Ketchens and the McNeils, Ketchens approached him in November 1997 and proposed a swap of real estate. Ketchens proposed giving Burkybile Tract A if Burkybile would give him a comparable triangle of land off the west side of 611 West Stoughton Street.

So, with the ambition of righting the westward tilt of his eastern boundary, Ketchens went about attempting to obtain title to Tract A. He solicited and obtained a total of eight quitclaim deeds to Tract A. The first deed, dated March 31, 1997, was from an attorney, Wendell G. Winkelmann, who, the parties agree, had no interest in Tract A to convey. It appears that Ketchens's objective, however, was to obtain color of title so that the county would assign a tax identification number to Tract A and bill him for the taxes and that by paying the taxes, he eventually, in seven years, would become the owner of Tract A. The problem was that section 13—109 of the Code of Civil Procedure (735 ILCS 5/13—109 (West 1996)) required actual possession of the land for seven years while paying the taxes thereon and the McNeils had been using Tract A as their driveway and did not show any inclination to stop doing so. Perhaps it was for that reason, during trial, that Ketchens's attorney disavowed any reliance on section 13—109 and Winkelmann's quitclaim deed.

In his answer, Ketchens likewise conceded he had acquired nothing from the second quitclaim deed, the one he obtained from Virginia Roppel on November 17, 1997. Roppel owned lot 5 before conveying it to Carl and Ann Burkybile in 1994, but, as we have already established from Frank Somers's deed to his sister, Tract A has not been a part of lot 5 since 1905. Moreover, Roppel insisted that she never made any claim to Tract A and had always assumed the driveway belonged to 609 West Stoughton Street. She thought the quitclaim deed was for property between 611 and 613 West Stoughton Street, and had she known it was for the driveway used by 609 West Stoughton Street, she never would have signed the deed. In any event, her deed was as ineffectual as Winkelmann's because neither she nor Winkelmann had any interest in Tract A to convey.

The remaining six quitclaim deeds are from grantors who, by being either Mattie Starkey's relatives or devisees of Mattie's niece Mary Somers Richards, at least have a stronger claim to Tract A than Roppel or Winkelmann. Those deeds are as follows: (1) a deed dated January 27, 1999, from Dorothy Somers Baker, also known as Dorothy O. Baker; (2) a deed dated February 2, 1999, from Robert J. Bash, also known as Robert Joseph Somers; (3) a deed dated February 4, 1999, from John F. Bash, also known as John Francis Somers; (4) a deed dated February 3, 1999, from Sandra Lou Snodgrass, also known as Sandra Lou Somers; (5) a deed dated February 9, 1999, from Lee H. Somers, also known as Lee Bert Hamill Somers; and (6) a deed dated January 26, 1999, from Barbara and Tim Roberts. A decree finding heirship, entered on August 9, 1956, in *In re* Estate of Martha J. Starkey, Champaign County case No. 15392, declares that Dorothy Somers Baker is Mattie's niece, Robert Joseph Somers is her great-nephew, John Francis Somers is her great-nephew, and Sandra Lou Somers is her great-niece. As we have already mentioned, Harry K. Somers was Mattie's nephew. According to a petition for probate of will and for letters testamentary in *In re* Estate of Harry K. Somers, Champaign County case No. 67—P—27, Harry K. Somers died on January 14, 1967, and Lee Bert Hamill Somers is one of his heirs.

The two nieces to whom Mattie devised 609 West Stoughton Street, Helen Somers and Mary Somers Richards, likewise have died and left wills. According to an affidavit of heirship in *In re* Estate of Helen Somers, Champaign County case No. 80—P—80, Helen died on February 6, 1980. Her will does not mention any particular real estate, but, in the seventh clause, she gives the rest, residue, and remainder of her estate, whether real, personal, or mixed, to her sister Mary Richards.

According to an affidavit of heirship in *In re* Estate of Mary Richards, Champaign County case No. 96—P—227, Mary Richards died on

June 3, 1996. She left a will dated June 16, 1987, and a codicil dated August 11, 1987. The only real estate Mary specifically mentions in her will is that "situated in Somer Township, Champaign, Illinois, being Township 20 North, Range 9 East of the Third Principal Meridian," which she devises to Barbara Roberts and Tim Roberts of Rural Route 1, Urbana. This does not appear to be Tract A. The codicil, however, contains the following residuary clause:

"I give, devise and bequeath all the rest and remainder of my estate, real, personal and mixed and of whatever kind and description wherever and situated [*sic*] to the following organizations and persons [in] the percentage set opposite their respective names:

The First United Presbyterian, 10%
Church of Urbana, Illinois

Kemmerer Village, Inc., Assumption, 20%
IL 62510

Society for Animal Protective, 10%
Legislation, P.O. Box 3719,
Georgetown Station,
Washington, DC 20007

The Humane Society of the United, 10%
States, a Charitable Corporation, now
maintaining its headquarters in the
District of Columbia

National Wildlife Federation, 10%
1412 — 16th St., N.W.
Washington, DC

University of Chicago, 10%
5801 Ellis Avenue,
Chicago IL 60637

Little Bothers [*sic*] of the Poor, 10%
1658 W. Belmont,
Chicago IL 60657

Barbara and Tim Roberts, RR #1, 5%
Urbana IL 61801, in equal shares,
or if either shall predecease me then
all to the one who survives me."

Thus, if by virtue of the presumption against intestacy, one construed Mattie's will as devising Tract A to Helen Somers and Mary Somers Richards and if Helen and Mary failed to convey Tract A to

the Haights, it would appear that Helen gave Tract A to Mary in the residuary clause of her will, making Mary the full owner of Tract A, and then Mary gave Tract A to the beneficiaries listed in the residuary clause of her codicil. That is, the chain of title would seem to lead to that conclusion unless title passed to someone else by adverse possession.

## 2. *Adverse Possession*

### a. The Construction of the Driveway

City records indicate that the turn-out for the driveway on Tract A was constructed in 1924. A coal scuttle was in the west wall of the house at 609 West Stoughton Street, and evidently the driveway was used for deliveries of coal. The house, garage, and driveway appear in a 1937 aerial photograph.

### b. The Haights

Gilbert P. Haight, Jr., testified that he and his wife, Shirley Haight, lived at 609 West Stoughton Street from November 13, 1972, to February 25, 1983. They parked in the driveway and used the garage for storage. To his knowledge, no one else parked in the driveway. He and his wife never erected a fence or put up a no-trespassing sign by the driveway. They never made any specific claim of title to the driveway. "The question never arose," he testified. The driveway went from the street to the garage, and he considered the driveway to belong to him and his wife, just as he considered the house to be theirs. He identified a photograph with his car parked in the driveway, and with a black felt-tipped marker, he drew a line along the west side of the driveway, signifying what he understood to be the western boundary of 609 West Stoughton Street. He used to mow the grass along the west side of the driveway. He had no conception of Tract A. On December 30, 1982, the Haights bought a house at 1706 Pleasant Street and put up the house at 609 West Stoughton Street for sale. In January 1983, they moved all their personal possessions out of the house on West Stoughton Street and into the house on Pleasant Street. They took their vehicles, too, and from that time forward, they no longer parked in the driveway on West Stoughton Street. To Gilbert's recollection, no one occupied the house on West Stoughton Street from the time he and his wife moved out in January 1983 until the time they sold the house on February 25, 1983.

### c. Turner and Condomitti-Turner

Gary L. Turner testified that from the time he and his wife, Geraldine Condomitti-Turner, bought 609 West Stoughton Street from the Haights to the time they sold it to the McNeils, they lived there. He

identified a photograph of the property with Geraldine's car in the driveway. They normally used the driveway as part of their residence. He mowed the driveway, took care of it, and considered it to be part of 609 West Stoughton Street. By saying he mowed the driveway, he was referring to a "thin buffer strip of grass" on the west side of the driveway, extending all the way back to the garage. He and his wife never parked in the garage, because it was too small for a modern car. Gary agreed with the line that Gilbert Haight, Jr., had drawn in the photograph, down the west side of the driveway: he considered that line to be the western boundary of 609 West Stoughton Street.

### d. The McNeils

The McNeils testified they used and maintained Tract A from the time they bought the house from Turner and Condomitti-Turner until the present day. They agreed with the line that Haight had drawn in the photograph—they, too, assumed that line was the western boundary of 609 West Stoughton Street.

### e. Roppel

Virginia Roppel owned 611 West Stoughton Street from 1976 until 1992, when she conveyed the property to a trust, of which she was a beneficiary. She insisted she never made any claim to any interest in Tract A. According to her, Tract A was used and maintained by the owners of 609 West Stoughton Street during the entire time she owned 611 West Stoughton Street.

### f. Burkybile

The current owner of 611 West Stoughton Street, Carl Burkybile, denied ever making any claim to Tract A. He testified he had seen the McNeils maintaining Tract A, and he agreed that the line that Haight had drawn on the photograph accurately indicated the boundary line between 609 West Stoughton Street and 611 West Stoughton Street as Burkybile understood it. The record appears to contain no evidence that any prior owner of 611 West Stoughton Street or 613 West Stoughton Street ever occupied or claimed ownership of Tract A.

### B. The Judgment on the McNeils' Amended Complaint

On April 24, 2009, the trial court entered a judgment finding the McNeils had not acquired title to Tract A by virtue of the deed to them from Turner and Condomitti-Turner. The court observed that "[t]he Somers to Haight, Haight to Turner[,] and Turner to McNeil deeds did not include Tract A within the description of the property conveyed." Neither did Mattie J. Starkey's will, although the contents of the will, considered as a whole, suggested that she intended to bequeath 609 West Stoughton Street, including Tract A, to her nieces

Helen Somers and Mary Somers Richards. The court reasoned that in order for it to enter a judgment that the McNeils were owners of Tract A, the court would have to reform not only the will but also the succeeding deeds by inserting into each document a description of Tract A. The court concluded that "public policy considerations" precluded it from rewriting the will and deeds.

As for the McNeils' alternative claim that they had become owners of Tract A by adverse possession, the trial court recognized that "the possession of successive disseisors [could] be joined together to make a continuous possession" for the required period of 20 years. The court found, however, that "[t]he deposition testimony of Gilbert and Shirley Haight, admitted into evidence at trial, was vague and indefinite and appeared to establish that the residence at 609 West Stoughton [Street] and Tract A were not in the possession of the Haights from sometime in January 1983 [to] February 25, 1983." Therefore, the court decided that the McNeils "had not sustained their burden of *** proving that the requirements for ownership of Tract A by adverse possession were met for the statutorily required period of [20] years."

The trial court concluded that "[a]bsent an ownership interest in Tract A," the McNeils had "no standing to seek a declaratory judgment as to [Ketchens's] ownership interest in the property." All the same, the court found that Ketchens had acquired nothing by the quitclaim deeds from Winkelmann and Roppel. The court, however, did not discuss the remaining six quitclaim deeds (consistently, perhaps, with its belief that the McNeils, lacking title, had no standing to establish Ketchens's lack of title).

Consequently, the trial court denied the McNeils' request for a declaratory judgment that Ketchens was not the owner of Tract A (count I), and the court also denied the McNeils' request for a declaratory judgment that they were the owners of Tract A, either by chain of title (count II) or by adverse possession (count III). In case Nos. 4—09—0388 and 4—09—0617, the McNeils appeal from this judgment.

### C. Ketchens's Motion To Disqualify Grosser and the McNeils' Resulting Motion for Sanctions

On January 17, 2007, Ketchens, through his attorney, Shayla L. Maatuka, filed a motion to disqualify the McNeils' attorney, Frederic M. Grosser. The motion, signed by Maatuka, alleges as follows:

"1. Plaintiff[s'] attorney, Frederic Grosser, is also the attorney for Cunningham Township.

2. In his capacity as attorney for Cunningham Township, he has access and undue influence on county officials.

3. There is evidence that Mr. Grosser has used this access and influence to taint evidence in this case. See Exhibit A[,] attached hereto.

4. There is an apparent conflict of interest [that] unduly prejudices the [d]efendant in this cause."

Exhibit A, referenced in paragraph 3 of the motion, is an affidavit of December 13, 2006, by Curt Deedrich, the chief assessment officer for Champaign County. In his affidavit, Deedrich states that since October 2, 1997, the permanent index number for Tract A has been 91—21—08—364—007. Before October 2, 1997, Tract A was assessed and taxed as part of 611 West Stoughton Street. Tract A has never been assessed and taxed as part of 609 West Stoughton Street. The tax assessments for Tract A have been sent to Ketchens from 1998 through 2006, and the taxes have been paid to date. On July 11, 2006, the permanent index number for Tract A was deleted. Deedrich investigated the deletion, and his investigation revealed the following:

"Joe Meents, Appraiser/Analyst, Champaign County Assessment Office, deleted the permanent index number[ ] and taxing history to this property without any official documentation such as a recorded deed, a plat or survey, a last will and testament, etc. Joe Meents stated to me and Mr. Gary Twist, Chief Deputy, Champaign County Assessment Office, that he made the change on the orders from Joanne Chester, Cunningham Township Assessor, to help ensure[ ] [that] Frederic Grosser, Cunningham Township Attorney, would win his case against Dr. Milorad P. Ketchens, M.D.[ ]"

On August 15, 2006, Deedrich reinstated the permanent index number of Tract A and its taxing history, on both the computer and the Web site of the Champaign County assessment office.

On February 22, 2007, Ketchens, through Maatuka, filed an amended motion to disqualify Grosser. The amended motion, signed by Maatuka, alleges as follows:

"1. Plaintiffs' attorney, Frederic Grosser, is also the attorney for Cunningham Township. He has been the Cunningham Township attorney for more than 29 years. In his capacity as Cunningham Township [attorney,] he personally participated in aiding the Cunningham Township [a]ssessor with [i]ssues related to the property that is the subject of the instant litigation. In his position as Cunningham Township [a]ttorney, Mr. Grosser deals with the legal issues involved in assessments and taxing of parcels in the township. In his position as the attorney for the [p]laintiffs[,] he has made the taxing history a 'material matter of clear and weighty importance' in this cause. See Exhibit A attached hereto.

2. Plaintiffs' attorney, Frederic Grosser[,] violated Rule 1.11 of the Illinois Rules of Professional [C]onduct by failing to disclose

the representation to the government agency and failing to obtain consent of the agency for the representation. See Exhibit B attached hereto.

3. Plaintiffs' attorney, Frederic Grosser[,] violated Rule 3.3(a)(4) of the Illinois Rules of Professional Conduct by offering evidence that is known to be false[,] included in the affidavit of Joanne M. Chester, Cunningham Township [a]ssessor, that is contrary to the official taxing records of Champaign County, Illinois. See Exhibits C, D, E, F, & G, attached hereto.

4. Plaintiffs' attorney, Frederic Grosser[,] violated Rule 3.3(a)(6) of the Illinois Rules of Professional Conduct by using his position as [t]ownship [a]ttorney to taint evidence in this case. See Exhibit C attached hereto.

5. Plaintiffs' attorney, Frederic Grosser[,] violated Rule 3.7 of the Illinois Rules of Professional Conduct by accepting and failing to discontinue employment in a cause where he could be called as a witness because of his position as Cunningham Township [a]ttorney and his involvement with the [t]ownship on matters concerning the property that is the subject of the instant litigation.''

The affidavit to which paragraph 3 of the amended motion refers apparently is Chester's affidavit of December 2, 2002, in which she states that she has never assessed Tract A as part of 611 West Stoughton Street but has always treated it as part of 609 West Stoughton Street. Her affidavit further states:

''15. The property identified as Tract A was never shown as a parcel separate from 609 West Stoughton Street until a change in October[ ] 1997[ ] by the Champaign County Board of Review[,] which involved the issuance of a permanent identification number for that part of the property.

16. Upon issuance of a separate number for the property identified as Tract A, I asked the [b]oard of [r]eview why [it] took that action. I was furnished by the [b]oard of [r]eview with a quitclaim deed from Wendell Winkelmann to Milorad Ketchens. I was informed by Wendell Winkelmann that his father had been the attorney for the estate of Aurora [Somers], widow of Frank [Somers], and that this was his connection with the property. I examined the records of the properties at 609, 611[,] and 613 West Stoughton Street[,] and I concluded that the lot lines were realigned by quitclaim deeds from Frank Somers to Mattie Somers in September[ ] 1905, and in November[ ] 1905, from Frank Somers to Willis and Ellen F. Case to Edgar D. Bell. The new lot lines were shown thereafter on a survey done by the county surveyor in 1948.''

On March 19, 2007, Ketchens, through his additional attorney and lead counsel, Richard J. Whitney, filed a "Reply to Plaintiffs' Response and Objection to Amended Motion To Disqualify Plaintiff[s'] Attorney." This memorandum, signed by Whitney, argued that Grosser had violated Illinois Rule of Professional Conduct 1.11 and that the supreme court's decision in *In re LaPinska*, 72 Ill. 2d 461, 381 N.E.2d 700 (1978), was "on all fours." The memorandum further contended:

"6. As in *La[P]inska*, [p]laintiffs' counsel is simultaneously representing a municipality and a private client 'with respect to matters in which he has substantial responsibility as a public official.' Defendant has presented public records demonstrating that [p]laintiffs' counsel is employed by Cunningham Township 'to specifically handle legal matters that are directly related to the township,' including advising the [t]ownship [a]ssessor on the very property dispute that is at issue in the case at bar. *** Even leaving aside the more damaging allegations made in the affidavit of Curt Deedrich attached to [d]efendant's [a]mended [m]otion, which implies a deeper collaboration between the [t]ownship [a]ssessor and the [t]ownship [a]ttorney, that fact alone is sufficient to disqualify [p]laintiff[s'] counsel from continuing to represent [p]laintiffs in this cause—and the conflict may not be waived, even with the informed consent of all parties, let alone based on [p]laintiffs' argument that [d]efendant was somehow dilatory in objecting to the conflict.

7. The very same circumstances also implicate Illinois Rule of Professional Conduct 3.7, insofar as they create an increasing likelihood that [p]laintiff[s'] counsel may be a material witness in this matter, with respect to his role advisor to the [t]ownship [a]ssessor."

On February 12, April 27, and July 27, 2007, the trial court held evidentiary hearings on the amended motion to disqualify Grosser. At the conclusion of the hearing on July 27, 2007, the court denied the motion.

On November 30, 2007, the McNeils, by Grosser, filed a motion to impose sanctions on Ketchens, Maatuka, and Whitney pursuant to Illinois Supreme Court Rule 137 (155 Ill. 2d R. 137) for the following reasons:

"1. The following allegations in the [']Motion to Disqualify Plaintiff[s'] Attorney[,'] filed January 17, 2007, are false:

In his capacity as attorney for Cunningham Township, [Grosser] has access and undue influence over county officials.

There is evidence that Mr. Grosser has used this access and influence to taint evidence in this case.

There is [an] apparent conflict of interest [that] unduly prejudices the [d]efendant in this cause.

2. The following allegations in the [']Amended Motion to Disqualify Plaintiff[s'] Attorney[,'] filed February 22, 2007, are false:

> In his capacity as Cunningham Township [attorney,] [Grosser] personally participated in aiding the Cunningham Township [a]ssessor with [i]ssues related to the property that is the subject of the instant litigation. In his position as Cunningham Township [a]ttorney, Mr. Grosser deals with legal issues involved in assessments and taxing of parcels in the township. In his position as the attorney for the [p]laintiffs[,] he has made the taxing history a 'material matter of clear and weighty importance' in this cause.

> Plaintiffs' attorney, Frederic Grosser[,] violated Rule 1.11 of the Illinois Rules of Professional [C]onduct by failing to disclose the representation to the government agency and failing to obtain consent of the agency for the representation.

> Plaintiffs' attorney, Frederic Grosser[,] violated Rule 3.3(a)(4) of the Illinois Rules of Professional Conduct by offering evidence that is known to be false[,] included in the affidavit of Joanne M. Chester, Cunningham Township [a]ssessor, that is contrary to the official taxing record of Champaign County, Illinois.

> Plaintiffs' attorney, Frederic Grosser[,] violated Rule 3.3(a)(6) of the Illinois Rules of Professional Conduct by accepting and failing to discontinue employment in a cause where he could be called as a witness because of his position as Cunningham Township [a]ttorney and his involvement with the [t]ownship on matters concerning the property that is the subject of the instant litigation.

[3.] The following assertions of fact in the [']Reply to Plaintiffs' Response and Objections to Amended Motion to Disqualify Plaintiff[s'] Attorney['] are false:

> *** Plaintiffs' counsel is simultaneously representing a municipality and a private client 'with respect to matters in which he has substantial responsibility as a public official.' ***

> The very same circumstances also implicate Illinois Rule of Professional Conduct 3.7, insofar as they create an increasing likelihood that [p]laintiffs' counsel may be a material witness in this matter ***."

On April 24, 2009, after hearings in December 2007 and January 2008, the trial court granted the McNeils' motion for sanctions. The court assessed sanctions in favor of the McNeils and against Ketchens, Maatuka, and Whitney jointly, and severally, in the amount of $20,500. The court found that Maatuka and Whitney both had failed to make

an adequate investigation into the scope of Grosser's responsibilities as an attorney for Cunningham Township. In the court's view, the evidence presented at the hearings on the amended motion to disqualify Grosser established that Grosser was not an official or employee of Cunningham Township but that instead, for more than 20 years, he had been paid a modest monthly retainer to handle any legal matters that were referred to him by the Cunningham Township supervisor, assessor, or board. In the past, Grosser had represented the township "in regard to the equalization factor to be applied to all real property in the [t]ownship." He also had "represented the [t]ownship in assessment appeals by owners of commercial and industrial properties before the Property Tax Appeal Board." The court found no evidence, however, that any legal matters relating to issues in the present case were ever referred to Grosser by the Cunningham Township supervisor, assessor, or board. Any information that Grosser obtained from governmental officials or employees in this case was information available to the general public. The court noted that counsel for Ketchens had "attempted to prove that an inappropriate contact between attorney Grosser and Cunningham Township Assessor Chester had occurred by eliciting hearsay upon hearsay testimony, which the [c]ourt disallowed." The court deemed *LaPinska* to be inapposite. So far as the court could see, there was no reason to believe that Grosser would be called as a witness to testify at trial in this case. Therefore, the court granted the motion for sanctions.

## II. ANALYSIS

### A. Necessary Parties

■ The parties do not mention the absence of necessary parties, but we feel obliged to broach the subject because there are cases saying we should do so *sua sponte*. *Oglesby v. Springfield Marine Bank*, 385 Ill. 414, 423, 52 N.E.2d 1000, 1004 (1944); *Lerner v. Zipperman*, 69 Ill. App. 3d 620, 625-26, 387 N.E.2d 946, 951 (1979). A necessary party is one whose presence is required in the litigation for any one of three reasons: (1) to protect an interest that the party has in the subject matter of the controversy that a judgment might materially affect in the party's absence, (2) to reach a decision that will protect the interests of those who are before the court, or (3) to enable the court to decide the controversy completely. *Pace v. Regional Transportation Authority*, 346 Ill. App. 3d 125, 145, 803 N.E.2d 13, 30 (2003).

Other than the Robertses, who have quitclaimed their interest in Tract A to Ketchens, the beneficiaries in the residuary clause of Mary Somers Richards's codicil are necessary parties. The McNeils prejudice only themselves, however (and, potentially, the efficiency of the judicial

system), by failing to name the beneficiaries. They do not prejudice the beneficiaries. The First United Presbyterian Church of Urbana, for example, and Kemmerer Village, Inc., are not necessary parties in the sense that the judgment in this case materially affects their interest. Since they never were joined as defendants, the judgment does not bind them. See *Chicago, Burlington & Quincy R.R. Co. v. Commerce Comm'n*, 364 Ill. 213, 223, 4 N.E.2d 96, 101 (1936). They and other beneficiaries in the residuary clause of Mary's codicil are necessary parties, however, in that their presence was required in order for the trial court to decide the controversy completely.

The controversy is not completely decided, because, theoretically, the beneficiaries in the residuary clause of Mary's codicil (except the Robertses, who have quitclaimed their interest to Ketchens) could file a complaint seeking a judicial declaration that they own 95% of Tract A (100% minus the Robertses' 5%). Then the McNeils would find themselves litigating the issue of adverse possession all over again. The beneficiaries could make a cogent argument that although Mattie never mentioned Tract A in her will or codicil, she intended to devise "all [her] real estate," as she said at the beginning of the fifth clause of her will. Further, because Tract A had been used as part of lot 4 since 1905, the presumption against intestacy arguably requires a construction of the will whereby Mattie devised Tract A to Helen and Mary along with lot 4 and the north 47.75 feet of lot 3. See *Cahill v. Michael*, 381 Ill. 395, 405, 45 N.E.2d 657, 662 (1942); *Strauss v. Strauss*, 363 Ill. 442, 447-48, 2 N.E.2d 699, 702 (1936). Moreover, the beneficiaries could argue that since Helen and Mary omitted the description of Tract A in their deed to the Haights, Helen and Mary retained ownership of Tract A and Helen's half share passed to Mary under Helen's will and then Mary's resulting 100% interest passed to the beneficiaries under Mary's codicil.

█ Granted, it seems improbable that the beneficiaries would regard Tract A as worth the time and money of litigation, but we are aware of no case holding that the status of an interested person depends on the amount or value of the land in which the person is interested. In any event, this uncertainty disadvantages the McNeils rather than the beneficiaries, and now that the trial is over and done with, we cannot undo the damage to judicial efficiency by reversing the judgment on the ground of the absence of necessary parties. Reversal seems to be warranted only if the judgment materially affects the absentee's interests. *Hobbs v. Pinnell*, 17 Ill. 2d 535, 536, 162 N.E.2d 361, 362 (1959). Because the judgment does not bind the beneficiaries, it poses no threat to their interests, and we do not find their absence to be cause for reversal. See *State Farm Mutual*

*Automobile Insurance Co. v. Haskins*, 215 Ill. App. 3d 242, 245, 574 N.E.2d 1231, 1234 (1991).

## B. Adverse Possession

### 1. *The Driveway as an Improvement Denoting Possession*

■ The doctrine of adverse possession is an application of the 20-year statute of limitation for the recovery of lands (735 ILCS 5/13—101 (West 1998)). *Joiner v. Janssen*, 85 Ill. 2d 74, 81, 421 N.E.2d 170, 174 (1981); *Miller v. Metropolitan Water Reclamation District of Greater Chicago*, 374 Ill. App. 3d 188, 189-90, 870 N.E.2d 1040, 1041 (2007). If the statute of limitations bars the titleholder from bringing an action to recover the real estate, the one who possessed the real estate for 20 years effectively becomes its new owner. Thus, the doctrine of adverse possession can establish the adverse possessor's title to the land and divest the previous titleholder of ownership. *Joiner*, 85 Ill. 2d at 81, 421 N.E.2d at 174. The 20-year period should not start running, however, until the titleholder has a visible, objective reason to know that someone is trespassing. The period cannot run on the sly. "For the law proceeds upon the presumption of an acquiescence, which cannot be where the possession and claim are unknown[ ] and the acts of possession are such as not to give notoriety to it." *McClellan v. Kellogg*, 17 Ill. 498, 504 (1856). Thus, the party claiming ownership by adverse possession must prove that the following five elements existed concurrently for 20 years: "(1) continuous, (2) hostile or adverse, (3) actual, (4) open, notorious, and exclusive possession of the premises, (5) under claim of title inconsistent with that of the true owner." *Joiner*, 85 Ill. 2d at 81, 421 N.E.2d at 174.

■ It might be argued that the use of Tract A by the Haights, Turner and Condomitti-Turner, and the McNeils was not hostile to the ownership of Tract A by Helen Somers and Mary Somers Richards. If the Haights themselves had laid down the gravel driveway over Tract A, that act clearly would have been hostile to Helen's and Mary's ownership, but the Haights are not the ones who laid down the driveway. Rather, the driveway already existed when Helen and Mary conveyed lot 4 and the northern part of lot 3 to the Haights. Helen and Mary must have intended the Haights to use Tract A, for the driveway covered Tract A and led to the garage. Use of property by permission of the owners is not adverse possession. *Deboe v. Flick*, 172 Ill. App. 3d 673, 675, 526 N.E.2d 913, 915 (1988).

The record appears to contain no evidence, however, that Helen and Mary ever gave the Haights permission to use Tract A. It probably never occurred to Helen and Mary that the Haights needed their permission. Such permission would have been superfluous unless

Helen and Mary intended to retain ownership of Tract A, and under the circumstances, it seems highly unlikely they had such an intent. Retaining Tract A, this thin wedge of land, would have been an inexplicable and useless act on their part, especially considering that the driveway covered Tract A and led to the garage—the garage they sold to the Haights along with the house. In all likelihood, they and the Haights both assumed, erroneously, that Tract A, covered by the driveway, was part of lot 4.

Possession cannot be permissive if neither the owner nor the possessor knows there is any encroachment. One cannot sensibly give another permission to use land unless one believes that the land belongs to oneself. *Cassidy v. Lenahan*, 294 Ill. 503, 507, 128 N.E. 544, 546 (1920). The present case is analogous to *Daily v. Boudreau*, 231 Ill. 228, 231, 83 N.E. 218, 219 (1907), in which the plaintiff and defendant erroneously assumed that a fence was located on the boundary between their properties until a survey informed them otherwise. At the time the defendant bought his land, the fence had been there for 10 years. As it turned out, the fence encroached on the plaintiff's land. *Daily*, 231 Ill. at 231, 83 N.E. at 219. From the time the defendant took possession of the land, however, until the commencement of the lawsuit, he occupied the land up to the line of the fence, and his occupation was for a period longer than 20 years. *Daily*, 231 Ill. at 231, 83 N.E. at 219. Therefore, the statute of limitations barred the plaintiff's action for trespass. *Daily*, 231 Ill. at 232, 83 N.E. at 219.

Likewise, in the present case, the 20-year statute of limitations will bar an action against the McNeils to recover Tract A, despite their long-standing unawareness that the deed to them did not include Tract A, because for more than 20 years, the driveway had been in existence and in plain sight and the only structure the driveway had served was the garage: it went straight from the street to the garage, skirting the house. Manifestly, the garage was part of the residential property at 609 West Stoughton Street. The garage stood at the southwest corner of the house, on the same lot, and the driveway led to the garage. The driveway was there, for all the world to see, during the 26 years that the Haights, Turner and Condomitti-Turner, and the McNeils owned and possessed the residential property (from November 13, 1972, when Helen and Mary conveyed the property to the Haights, to December 22, 1998, when the McNeils filed their complaint). The adverse possessions by these successive possessors of Tract A, who were in privity, can be tacked together to establish a continuous possession for the statutory period of limitation. See *Mitchell v. Chicago, Burlington & Quincy Ry. Co.*, 265 Ill. 300, 306-07, 106 N.E. 833, 836 (1914). The driveway was an improvement of Tract A, and it was an

improvement that pointed solely and unmistakably to the residence at 609 West Stoughton Street. " 'Such improvements or acts of dominion over the land as will indicate to persons residing in the immediate neighborhood who has the exclusive management and control of the land are sufficient to constitute possession.' " *Joiner*, 85 Ill. 2d at 82, 421 N.E.2d at 174, quoting *Augustus v. Lydig*, 353 Ill. 215, 222, 187 N.E. 278, 281 (1933).

The successors of Helen Somers and Mary Somers Richards did not have to enclose Tract A with a fence or build a structure on Tract A to take possession of it. All they had to do was perform public acts of ownership, the kinds of acts one would perform on property of that character only if one claimed the property. See *Davis v. Haines*, 349 Ill. 622, 628-29, 182 N.E. 718, 721 (1932). Generally, people do not lay a corridor of gravel over land unless they claim the land as their own. It is immaterial that the driveway predated the Haights' ownership. The germane facts are that (1) the driveway led to what was obviously their garage and (2) the driveway was an improvement announcing to the neighborhood that the land underneath the driveway belonged to the Haights, and then to Turner and Condomitti-Turner, and then to the McNeils.

## 2. *The Inconsequence of Temporary Vacancy*

In its judgment, the trial court stated: "The deposition testimony of Gilbert and Shirley Haight *** appeared to establish that the residence at 609 West Stoughton [Street] and Tract A were not in the possession of the Haights from sometime in January 1983 [to] February 25, 1983," the approximately one-month period from when the Haights moved out of the house until Turner and Condomitti-Turner moved in. As a matter of law, this temporary vacancy of the house, incidental to its sale, did not interrupt the Haights' adverse possession of Tract A. From a purely legal point of view, declaring this temporary vacancy to be a relinquishment of possession is simply incorrect and irreconcilable with case law. The holding is legally incorrect because it erroneously assumes that living in the house and parking in the driveway were the only ways by which the Haights could have possessed Tract A.

Actually, the driveway itself, which covered Tract A and served the garage, was an " 'improvement[ ] *** indicat[ing] to persons residing in the immediate neighborhood' " that the owners of the garage, the Haights, had " 'the exclusive management and control of the land' " underneath the driveway. The existence of these improvements, *i.e.*, the driveway plus the garage beside the house, was " 'sufficient to constitute possession.' " *Joiner*, 85 Ill. 2d at 82, 421 N.E.2d at 174,

quoting *Augustus*, 353 Ill. at 222, 187 N.E. at 281. Except when visiting or asserting a good-faith claim, responsible people do not park in a driveway leading from the street to someone else's garage, because it is understood that the owner of the garage claims the driveway. The owner need not put up a sign to that effect any more than the owner need hang a sign on the door of the house saying, "This is my doorknob to my front door." The owner is entitled to assume that passersby have a reasonable level of perceptiveness.

Given that the land was improved with a driveway and the driveway, by all appearances, belonged exclusively to the residence at 609 West Stoughton Street, the temporary vacancy of the residence did not destroy the continuity of possession. The house, garage, and driveway were still there, and the owners of 609 West Stoughton Street could use the driveway in any manner that pleased them, by parking their car on the driveway—or not parking on the driveway. See *Downing v. Mayes*, 153 Ill. 330, 336, 38 N.E. 620, 622 (1894). No one took possession of Tract A adversely to the Haights and their successors during the 20 years; hence, their possession was uninterrupted for the statutory period. See *Downing*, 153 Ill. at 336, 38 N.E. at 622.

Abandoning Tract A would have broken the continuity of possession, but by leaving the house vacant for approximately a month—which was merely the interim between moving out of the house and turning it over to the new owners—the Haights did not, by any reasonable view, *abandon* the property. " 'In order to destroy the continuity of possession, the vacancy must not be merely occasional, such as occurs in every case where a party, from some cause, *** shuts up his property for a short time, or, indeed, for a long time.' " *Downing*, 153 Ill. at 336, 38 N.E. at 622, quoting *Hughs v. Pickering*, 14 Pa. 297, 301 (1850). For example, failing to cultivate a field for a season does not break the continuity of possession if there is a reason for letting the field lie fallow, such as flooding. *Downing*, 153 Ill. at 336-37, 38 N.E. at 622. Or, to take an example that is closer to the present case, if the property is vacant merely because the old tenant has moved out and the new tenant has not yet moved in or because the adverse possessor of the property has been unable to find a new tenant, the temporary vacancy does not constitute an abandonment or a break in the continuity of possession. *Downing*, 153 Ill. at 337-38, 38 N.E. at 622; *Dawson v. Tumlinson*, 150 Tex. 451, 458, 242 S.W.2d 191, 195 (1951); *Doe ex dem. Windsor Realty Co. v. Finnegan*, 210 Ala. 314, 316, 97 So. 822, 824 (1923); *Johnston v. City of Albuquerque*, 12 N.M. 20, 29-30, 72 P. 9, 11 (1903).

Likewise, the Haights did not abandon Tract A by moving out of 609 West Stoughton Street in order that a buyer of the house could

move in. Possession does not require occupancy. *Eddy v. Gage*, 147 Ill. 162, 169, 35 N.E. 347, 349 (1893). "[P]ossession of land may be had in different modes[:] by enclosure, by cultivation, by the erection of dwellings or other improvements, or, in fact, any use that clearly indicates an appropriation to the use of the person claiming to hold the property." *Eddy*, 147 Ill. at 169, 35 N.E. at 349. The driveway was a mode of possessing Tract A. It would be unreasonable to deny that the driveway was an improvement giving notice to the neighborhood that the owners of 609 West Stoughton Street claimed the strip of land that the driveway covered.

## C. Sanctions

### 1. *The McNeils' Motion To Strike Part of Ketchens's Brief*

In his brief in case No. 4—09—0393, Ketchens requests that we reverse two orders: (1) the trial court's order of July 27, 2007, denying his amended motion to disqualify Grosser and (2) the court's order of April 24, 2009, granting the McNeils' motion for sanctions. The McNeils have filed a motion to strike the part of Ketchens's brief pertaining to the order of July 27, 2007, because in his notice of appeal, Ketchens announces he is appealing only from the order of April 24, 2009.

■ In response to the McNeils' motion, Ketchens agrees that we "lack[ ] jurisdiction to review or enter any order with respect to the July 27, 2007[,] ruling *per se*," but he disagrees that we should strike from his brief all discussion of the correctness of that order. According to him, that would be an overreaction. For if the amended motion to disqualify Grosser was meritorious and the denial of the amended motion was incorrect, the subsequent award of sanctions on the basis of the supposed frivolity of the amended motion was an abuse of discretion. We agree with Ketchens's qualified concession. Therefore, we deny the McNeils' motion to strike the portion of Ketchens's brief pertaining to the order of July 27, 2007. Nevertheless, we will disregard Ketchens's request to reverse that order.

### 2. *Why Ketchens, Maatuka, and Whitney Arguably Deserved To Be Sanctioned*

#### a. The Representation That Grosser Violated Illinois Rule of Professional Conduct 1.11

■ When reviewing the trial court's decision to grant or deny a motion for sanctions pursuant to Illinois Supreme Court Rule 137 (155 Ill. 2d R. 137), we ask whether the court abused its discretion. *Whitmer v. Munson*, 335 Ill. App. 3d 501, 514, 781 N.E.2d 618, 629 (2002). The court abused its discretion only if no reasonable person

could agree with the court's decision. *Whitmer*, 335 Ill. App. 3d at 514, 781 N.E.2d at 629. If reasonable people could differ, we will affirm the sanctions. *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1074, 651 N.E.2d 601, 607 (1995).

Thus, on appeal, we ask whether any reasonable person could agree with the trial court that the motion to disqualify Grosser, the amended motion to disqualify him, and Whitney's supporting memorandum violated the certificate implied in the signatures on those documents, namely, that "to the best of [the signer's] knowledge, information, and belief formed after reasonable inquiry, [the document] is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." 155 Ill. 2d R. 137. On appeal, as in trial court, Ketchens relies primarily on *LaPinska* and Illinois Rule of Professional Conduct 1.11 (134 Ill. 2d R. 1.11) as authorities for the proposed disqualification of Grosser. Therefore, we ask whether any reasonable person could agree with the trial court that due inquiry into the facts and law would have yielded the conclusion that *LaPinska* and Illinois Rule of Professional Conduct 1.11 did not require the disqualification of Grosser. In asking this question, we apply an objective standard, not a subjective standard that would be satisfied by "honest beliefs." *Fremarek*, 272 Ill. App. 3d at 1074-75, 651 N.E.2d at 607.

We first consider the meaning of *LaPinska* and Illinois Rule of Professional Conduct 1.11. In *LaPinska*, 72 Ill. 2d at 464, 381 N.E.2d at 701, the administrator of the Attorney Registration and Disciplinary Commission (ARDC) brought an action against an attorney, Karl G. LaPinska, on the grounds that he had accepted private employment that was in direct conflict with his public duties as an attorney for the city of Princeton and he had willfully misused his official position to gain a favorable settlement of the private controversy. The only question before the supreme court was the discipline LaPinska should incur for this unethical conduct. *LaPinska*, 72 Ill. 2d at 464, 381 N.E.2d at 701.

LaPinska's own testimony revealed the following facts. Robert E. Bird, Sr., a builder and real-estate broker in Princeton, built a house on a city lot that measured 80 feet by 140 feet. *LaPinska*, 72 Ill. 2d at 464, 381 N.E.2d at 701. The house, which was 60 feet wide, stood within 4 feet of the western boundary of the lot, in violation of a Princeton zoning ordinance prohibiting residences from being built closer than 10 feet from the side boundary of any lot. *LaPinska*, 72 Ill. 2d at 464-65, 381 N.E.2d at 701. After building the house but before selling it, Bird sold 10 feet along the east side of the lot to the owner of the adjacent lot, thereby violating the zoning ordinance again. *LaPinska*,

72 Ill. 2d at 465, 381 N.E.2d at 701. Bird hired LaPinska to obtain title papers on the lot. *LaPinska,* 72 Ill. 2d at 465, 381 N.E.2d at 701.

Bird then sold the house to Thomas and Pauline Kutella for $33,500. *LaPinska,* 72 Ill. 2d at 465, 381 N.E.2d at 701. Incensed because they had purchased a 70-foot lot that they had thought was an 80-foot lot, the Kutellas attended a meeting of the Princeton city council and demanded that the city charge Bird with violating the zoning ordinance. *LaPinska,* 72 Ill. 2d at 465, 381 N.E.2d at 701. LaPinska was at the meeting because he was the city attorney. He told the Kutellas to stop by his office and sign a formal complaint. The Kutellas did so, and the complaint was served on Bird. *LaPinska,* 72 Ill. 2d at 465, 381 N.E.2d at 701. In a hearing on the complaint, however, LaPinska recommended only the minimum fine and told the trial court that the city had no further interest in pursuing the matter. *LaPinska,* 72 Ill. 2d at 465, 381 N.E.2d at 701. On that understanding, Bird pleaded guilty, and the court assessed the minimum fine of $10 along with $5 in costs. *LaPinska,* 72 Ill. 2d at 465-66, 381 N.E.2d at 701.

Displeased with this lenient treatment of Bird, Thomas Kutella stopped by LaPinska's office and demanded that the city prosecute Bird for a continuing violation of the zoning ordinance. *LaPinska,* 72 Ill. 2d at 466, 381 N.E.2d at 701-02. LaPinska recommended that Kutella attend the next meeting of the city council and make his position known. In the meantime, Kutella and LaPinska entered into a contingent-fee agreement, whereby LaPinska would represent the Kutellas in a civil suit against Bird for breach of contract and fraud in connection with the sale of the property. *LaPinska,* 72 Ill. 2d at 466, 381 N.E.2d at 702.

At the next meeting of the city council, Kutella announced that he wished to sign daily complaints against Bird for continuing violations of the zoning ordinance. LaPinska was present at the meeting, and as the city attorney, he would be responsible for prosecuting the quasi-criminal charges against Bird. Nevertheless, LaPinska did not inform city officials that he was representing the Kutellas privately in the same matter. *LaPinska,* 72 Ill. 2d at 466, 381 N.E.2d at 702.

LaPinska and Bird then entered into settlement negotiations. They signed a memorandum stating that the civil case could be settled for $63,500 ($5,000 of which would go to LaPinska under the contingent-fee agreement) provided that the Kutellas signed a release and LaPinska recommended to the city that a variance or occupancy permit be granted for the property. *LaPinska,* 72 Ill. 2d at 467, 381 N.E.2d at 702. Using the stationery of the city attorney of Princeton, LaPinska wrote Bird that in the event of a settlement with the Kutel-

las, the city would issue an occupancy permit and would entertain no further complaints against Bird in connection with the zoning violation. *LaPinska*, 72 Ill. 2d at 467-68, 381 N.E.2d at 702.

The supreme court found LaPinska to be in a conflict of interest. His loyalty to the Kutellas could have compromised his independent judgment on behalf of the city of Princeton. LaPinska exercised his judgment to prosecute the zoning violation, or not to prosecute it, as the interests of his other clients, the Kutellas, dictated. See *LaPinska*, 72 Ill. 2d at 469, 381 N.E.2d at 703. The supreme court said: "The serious impropriety of an attorney accepting private employment with respect to matters in which he has substantial responsibility as a public official is well established." *LaPinska*, 72 Ill. 2d at 470, 381 N.E.2d at 703-04.

The conflict of interest between governmental and private employment now is covered by Rule 1.11 of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.11). Paragraphs (a) and (d) of that rule provide as follows:

"(a) Except as otherwise expressly permitted by law, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after disclosure. ***

\* \* \*

(d) As used in Rule 1.11, the term 'matter' denotes:

(1) any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest[,] or other particular matter involving a specific party or parties; and

(2) any other matter covered by the conflict of interest rules of the appropriate government agency." 134 Ill. 2d R. 1.11.

Thus, unless the law otherwise allows, Grosser may not represent the McNeils in a "matter" in which he "participated personally and substantially" as an attorney for Cunningham Township unless the township consented after he explained all the relevant facts. It appears that the only "matter" in which Grosser has represented the McNeils is the present matter, this case. The issues in this matter, as framed by the amended complaint, are whether Ketchens owns Tract A (count I), whether the McNeils own Tract A by virtue of the conveyance to them from Turner and Condomitti-Turner (count II), and whether the McNeils own Tract A by adverse possession (count III). Given these issues, Grosser could not have participated personally and substantially in the same matter as an attorney for Cunningham Township, because the township has nothing to do with these issues.

The township has no say and no influence on the determination of who is the owner of Tract A. For that reason, *LaPinska* is clearly distinguishable. The attorney in *LaPinska* used his position as the city attorney to influence the outcome of the civil case in which he was representing the Kutellas. He used his power as the city attorney to strong-arm Bird into agreeing to a settlement. In the present case, Grosser did not use his position as the township attorney to try to influence the outcome of this case. The present ownership of Tract A is determined solely by wills, codicils, deeds, or the adverse possession of Tract A for 20 years, not by the activities of the township. Therefore, what Grosser does as the township's attorney can have no bearing on this case.

The temporary deletion of a permanent index number for Tract A at the instigation of the township assessor is irrelevant to the issues in this case, and a reasonable inquiry would have perceived the irrelevancy. The county can assign a permanent index number to Tract A and send Ketchens the tax bills, and he can pay the taxes on Tract A *ad infinitum*, and yet he will be no closer to owning Tract A because he has not actually possessed it for seven years. See 735 ILCS 5/13—109 (West 1998). Nevertheless, because of Ketchens's and his attorneys' pleadings and memoranda, three hearings were taken up mostly with litigating the inconsequential question of whether Grosser advised Chester to arrange for the deletion of the permanent index number to Tract A (which, in any event, Deedrich soon restored). A reasonable person could agree with the trial court that this was a waste of time and resources.

Setting aside the fundamental problem that the existence or nonexistence of a permanent index number makes no difference to the outcome of this case, a reasonable person could agree with the trial court that Ketchens and his attorneys failed to perform an adequate investigation before representing to the court that Grosser was behind the deletion of the permanent index number. Apparently the only evidence Ketchens had in this respect was the following remark in Deedrich's affidavit: "Joe Meents stated to me and Mr. Gary Twist, Chief Deputy, Champaign County Assessment Office, that he made the change on the orders from Joanne Chester, Cunningham Township Assessor, to help ensure[ ] [that] Frederic Grosser, Cunningham Township Attorney, would win his case against Dr. Milorad P. Ketchens, M.D.[ ]" This remark by Deedrich is, as the court observed, "third-hand hearsay," and, really, it is not even hearsay evidence that Grosser told Chester to arrange for the deletion of the permanent index number. The idea could have originated with Chester. In the hearing of July 27, 2007, on the amended motion to disqualify him, Grosser

denied being involved with permanent index numbers in any way. He explained that permanent index numbers were issued by the board of review, which was part of the county, not the township. Permanent index numbers are beyond the purview of the township and, therefore, beyond the purview of Grosser as attorney for the township.

### b. The Representation That Grosser Violated Illinois Rule of Professional Conduct 3.7

■ Illinois Rule of Professional Conduct 3.7 provides that, with certain exceptions, "[a] lawyer shall not accept or continue employment in contemplated or pending litigation if the lawyer knows or reasonably should know that the lawyer may be called as a witness on behalf of the client." 134 Ill. 2d R. 3.7. The clients in this case are the McNeils. Grosser had no reason to know he would be called as a witness on their behalf. He personally had nothing to do with the essential issues in this case. The representation that he violated Rule 3.7 is not well grounded in fact or law.

### c. The Representation That Grosser Violated Illinois Rule of Professional Conduct 3.3(a)(4)

■ The amended motion to disqualify Grosser accuses him of violating Illinois Rule of Professional Conduct 3.3(a)(4) (134 Ill. 2d R. 3.3(a)(4)) by offering evidence that he knew to be false, namely, Chester's affidavit. The conflict between Chester's affidavit and Deedrich's affidavit affords an insufficient basis for inferring that Grosser knew Chester's affidavit to be false.

### d. The Representation That Grosser Violated Illinois Rule of Professional Conduct 3.3(a)(6)

■ The amended motion to disqualify Grosser also accuses him of violating Illinois Rule of Professional Conduct 3.3(a)(6) (134 Ill. 2d R. 3.3(a)(6)) "by using his position as [t]ownship [a]ttorney to taint evidence in this case." In support of this accusation, the amended motion cites Deedrich's affidavit. By "tainting evidence," Ketchens apparently means the deletion of the permanent index number. As we have explained, Deedrich's affidavit is too ambiguous to support a representation that Grosser actually advised Chester to arrange for the deletion of the permanent index number. Further, Rule 3.3(a)(6) prohibits a lawyer from counseling or assisting the client in conduct the lawyer knows to be illegal or fraudulent, and Ketchens has presented no authority or reasoned argument for the proposition that deleting the permanent index number was either illegal or fraudulent. Evidently, Chester was trying to prevent fraud rather than commit fraud. She thought that Ketchens had dishonestly or illegitimately

obtained the permanent index number by recording quitclaim deeds from grantors such as Winkelmann, who had no arguable interest in Tract A to convey.

Therefore, we find no abuse of discretion in the imposition of sanctions on Maatuka, Whitney, and Ketchens jointly and severally. Along with Maatuka, Ketchens signed the motion to disqualify Grosser as well as the amended motion to disqualify him. Whitney signed a memorandum arguing that the trial court should grant the amended motion. Illinois Supreme Court Rule 137 says that "if a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction." 155 Ill. 2d R. 137.

## III. CONCLUSION

For the foregoing reasons, in case Nos. 4—09—0388 and 4—09—0617, we affirm the trial court's judgment on count II of the McNeils' amended complaint but reverse its judgment on counts I and III. In case No. 4—09—0393, we affirm the award of sanctions pursuant to Rule 137.

No. 4—09—0388—Affirmed in part and reversed in part.
No. 4—09—0617—Affirmed in part and reversed in part.
No. 4—09—0393—Affirmed.

STEIGMANN and POPE, JJ., concur.