NOTICE
Decision filed 05/06/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230333-U

NO. 5-23-0333

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PAUL LEON POLL, Individually and as Trustee of the Paul Leon Poll Living Trust Agreement, | ) ) ) | Appeal from the Circuit Court of Champaign County. |
| Plaintiff and Counterdefendant-Appellant, | ) ) | |
| v. | ) ) | |
| MARK N. WILLIAMS and DEBORAH D. WILLIAMS, Individually and as Trustees of the Mark N. and Deborah D. Williams Revocable Living Trust | ) ) ) | No. 18-L-61 |
| Defendants and Counterplaintiffs-Appellees, | ) ) ) | |
| and | ) ) | |
| ROBERT E. LALEY, SUSAN D. LALEY, CHRISTOPHER B. ARNOTT, and ANGELA N. ARNOTT, | ) ) ) | Honorable |
| Defendants. | ) ) | Benjamin W. Dyer, Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The judgment of the trial court is affirmed where the evidence failed to support a finding of adverse possession related to the disputed parcel.

¶ 2    Plaintiff and counterdefendant, Paul Poll, appeals the trial court's April 4, 2023, judgment finding limited adverse possession and therefore granting in part, and denying in part, Mr. Poll's

1

complaint, and granting in part and denying in part defendants and counterplaintiffs Mark and Deborah Williams's complaint. For the reasons that follow we affirm the judgment.

¶ 3                                                    I. BACKGROUND

¶ 4     On April 11, 2018, Mr. Poll filed a four-count complaint against his neighbors, Mark and Deborah Williams and Robert and Susan Laley. The complaint alleged that Mr. Poll purchased his property on March 28, 1979. Count I alleged a quiet title action against Robert and Susan Laley.[1] Count II alleged a quiet title action against Mark and Deborah Williams. In that count, Mr. Poll claimed that he owned portions of the Williamses' property by adverse possession. Count III alleged trespassing against the Williamses based on their cutting trees and bushes on the disputed parcel and dumping dirt on what Mr. Poll claimed was his property. Count IV alleged wrongful tree cutting against the Williamses and requested "treble damage for the stumpage value of the removed trees pursuant to 740 ILCS 185/2." A March 12, 2018, survey performed by Wesley Meyers was attached to Mr. Poll's complaint showing the areas on defendants' properties where Mr. Poll claimed ownership by adverse possession. In order to delineate the property more clearly at issue, we include the relevant portion of Mr. Meyers' survey.

---

[1]On June 15, 2018, Robert and Susan Laley sold their property to defendants Christopher and Angela Arnott. On August 10, 2018, plaintiff moved for leave to file an amended complaint that added a fifth count. Count V requested quiet title of the property now owned by Mr. and Mrs. Arnott. Plaintiff's motion for leave was granted and the amended complaint was filed on August 31, 2018. On August 12, 2019, a judgment order by stipulation related to count I was filed in which defendants Robert and Susan Laley conceded the property in count I belonged to Mr. Poll. Mr. and Mrs. Arnott also signed the stipulation. A second judgment order related to count V was filed on September 10, 2019. None of these defendants are involved in the subject appeal.



¶ 5    On May 15, 2018, the Williamses filed an answer disputing Mr. Poll's claims and also filed two counterclaims against Mr. Poll. The first counterclaim requested ejectment and was based on a well and a portion of Mr. Poll's paved driveway that was on their property. The second counterclaim was based on trespass and involved the same areas of their property. On June 4, 2018, Mr. Poll filed an answer to the Williamses' counterclaim disputing the allegations therein.

¶ 6    On September 6, 2022, the Williamses filed a motion for summary judgment stating it was undisputed that Mr. Poll did not legally own the property, no recordings of Mr. Poll's alleged property line existed, Mr. Poll's surveyor testified that Mr. Poll directed him to where the alleged property line was located, and the monuments were set at Mr. Poll's direction. The motion claimed that the discovery depositions failed to reveal that Mr. Poll did anything with the disputed property

3

and when the trees died the Williamses took them out. The motion further alleged that Mr. Poll could not prove adverse possession and therefore could not prove trespass or the wrongful tree cutting claim. The motion further contended that insufficient information was provided to support the wrongful tree cutting claim. Attached to the motion were surveys from 2013 and 2018 obtained by Mr. Poll and the depositions of Mark and Deborah Williams, Wesley Meyers, and Paul Poll.

¶ 7    On September 21, 2022, Mr. Poll filed a response stating that he had been in possession of the subject property due to his 50 years of ownership of his own property and therefore he adversely possessed the disputed parcel. He disputed obtaining a 2013 survey which revealed the property belonged to the Williamses. Attached to the response were affidavits from Steven Poll (plaintiff's nephew) that stated in 2015, dirt was dumped on the disputed parcel, and Steven told the dump truck driver that he needed to get off his uncle's property. Steven also told Mrs. Williams that she needed to tell the dump truck driver to get off his uncle's property. Steven's affidavit also stated that someone put a section of fence on his uncle's property. Attached to the response were the warranty deeds from Mr. Poll's purchase of the property in 1979 and May 2013 pictures of Mr. Poll's cars parked on the driveway that was on the Williamses' property. No ruling was issued on the motion.

¶ 8    On February 22, 2023, the Williamses renewed their motion for summary judgment and included a claim of *laches* stating that even if Mr. Poll could prove his adverse possession claim, the doctrine of *laches* barred the claim. As to the adverse possession claim, the Williamses noted the contradictory testimony from Mr. Poll regarding the fence post that was allegedly a marker in his first deposition to now claiming the fence post had no significance in his second deposition. In response, Mr. Poll claimed there were numerous issues of material fact created by the Williamses that precluded summary judgment.

4

¶ 9    The case proceeded to hearing on March 15, 2023. At the beginning of the hearing, the trial court granted summary judgment to the Williamses on count IV because no stumpage value was ever provided for the trees. Thereafter, Mr. Poll began presenting his case-in-chief.

¶ 10    Mr. Poll testified that he originally rented the property from Edwin and Amy Hansen in 1971 and later purchased the property from them on March 28, 1979. When he moved in, Mr. Hansen showed him around the property and told him where the boundaries were. Mr. Hansen indicated that a rock was the boundary for the east side of the property and then the line moved north. Mr. Poll testified that there was a gravel driveway on his side of the boundary line. He stated that he installed a new well in 1981 and eventually paved the driveway. The west portion was paved in 2005 and the east portion was paved in 2006. He stated that he did not know who planted the pine trees but believed it was his wife.

¶ 11    Mr. Poll agreed that Mr. and Mrs. Williams obtained a survey in 2013, and stated they did not provide him with a copy. He stated that he obtained a survey later that same year because there were survey markers left in the field. He stated that his survey revealed a difference in what Mr. Hansen stated was the property line. The survey revealed that his property boundary was much closer to his garage than what Mr. Hansen described. After he received his 2013 survey, Mr. Poll continued to use and take care of that portion of the property that went beyond the actual property line. In 2015, the Williamses dumped dirt alongside the garage which was west of what he believed was the occupation line and north of the driveway. His nephew, Steven, said something on his behalf when the dirt was dumped. Mr. Poll later contacted an attorney and identified a cease-and-desist letter he received from the Williamses' attorney on May 12, 2015, regarding Mr. Poll's use of their property. Mr. Poll further identified a copy of a response his attorney sent to the

5

Williamses' attorney claiming he looked at the property and believed Mr. Poll possessed the property via adverse possession.

¶ 12 Mr. Poll testified that the Williamses later cut down his fruit trees without asking as well as some of the pine trees. He disputed ever seeing compost under the pine trees. He obtained a new survey in 2018, in which the surveyor was asked to prepare a boundary survey of what Mr. Poll believed was his property line. Mr. Poll reviewed the 2018 survey and stated it accurately represented where he believed the property line was.

¶ 13 On cross-examination, Mr. Poll agreed that the prior owner of his property was dead. He was unsure if there was ever a fence along his driveway. He agreed that the survey did not go straight north as he claimed the line did. It went straight to a point and then angled. He agreed that Mr. Hansen stated the line ran straight north of the rock. He did not remember why the line was angled. He stated that Mr. and Mrs. Jones (the prior owner of the Williamses' property) never came to his property. He disputed but later agreed that the dirt was dumped by the truck hired by the Williamses. He was also asked about who planted the trees and was impeached with his deposition testimony that stated someone else planted the trees.

¶ 14 Mr. Poll disputed providing photographs in discovery that he was shown during the hearing. He stated he could not show the line of demarcation in a picture of the property as it was in the 1970s and further disputed that the picture from 2002 showed a line of demarcation. He could not recall if there was a fence alongside the driveway when he first moved into the house. He stated he could not remember if his prior deposition testimony was taken under oath. Upon review of his deposition testimony, Mr. Poll testified that there was fence at the corners of the property but stated it was just for decoration. He stated the fence was on the inside of the driveway. He then reviewed a photograph which contained a picture of him on the driveway and stated the

fence ran east along the Williamses' property. He stated the property line was not defined by the fence; it was defined by a diagonal line through the rock that was on the other side of the fence. Nothing but the rock defined the boundary, and he disputed that a fence post was by the rock. He also disputed that he said otherwise in his deposition. He was then impeached with his prior deposition testimony and stated that his four prior statements about the fence post from his depositions were wrong.

¶ 15     Mr. Poll stated that the planted pine trees were the boundary, and they were on his side of the property, not on the Williamses' property. He stated that he previously planted a garden in the area between his house and what he thought was the property line but later took it out and grew grass that he cut. He had no idea who planted the pine trees. He stated all the trees were taken out the same day. He did not say anything to anyone when the trees came out. He disputed that the Williamses gave him permission to ride his lawn mower along the side of his garage to get to his backyard. He agreed that he never said anything to the Williamses about his ownership of the property.

¶ 16     Steven Poll, the plaintiff's nephew, attended school with Mr. Poll's daughter, Linda. He was at his uncle's residence about three times a week back in 1972. He stated that in 1972, the house was red and the driveway, which was two cars wide, was gravel. On the east side was a grassy area that was an unkempt pasture. He guessed that it was approximately 15 feet between Mr. Poll's garage and the pasture. When his uncle and aunt moved in, there was a well located between the garage and the house, partially behind the house. His uncle installed a new well in 1981. The new well was situated approximately eight feet southeast of Mr. Poll's garage. The well was still there and was used for the property.

¶ 17    Steven stated his aunt had a flower garden between the garage and the pasture. His uncle also parked his boat on the driveway. His aunt would park on the side closer to the garage and his uncle parked on the east side. He stated that his uncle talked to him about trees being removed from the property in late 2013 or early 2014. Thereafter, his uncle obtained a survey. Steven recommended his uncle obtain an attorney.

¶ 18    Steven was aware of the incident involving a dump truck backing across his uncle's driveway and dumping dirt. His uncle called him that morning and said someone was dumping dirt on his property. Steven drove out to the property and confronted the dump truck driver and asked what he was doing. When the driver told him, Steven told the driver he was trespassing on private property. Steven said that Mrs. Williams came out and told him that he could not tell the dump truck driver what to do because he was her employee. Steven then told them they were both trespassing and handed Mrs. Williams a paper with the Illinois statute on adverse possession. He stated the dump truck was small to medium sized used by landscaping companies and was filled with dirt. He stated that some of the dirt, approximately two to three loads, was dumped before he got there. The dirt was dumped directly north of the end of his uncle's driveway and three to four feet east of his uncle's garage. The dirt was still there, and Steven stated the Williamses put mulch and some plants in the dirt at a later date.

¶ 19    As to the fence, Steven stated that one short section went north and south and was about six to eight feet long. He did not recall the condition of the fence. He stated that his uncle would mow grass two or three feet over on the other side of the fence. The fence post was no longer there. The last time he recalled seeing the fence post was in the early to mid-seventies. He stated that his uncle's property line was east of where the post was and was unsure if the post marked anything.

¶ 20    On cross-examination, Steven agreed that his uncle's memory was not what it once was. Although he was unsure, he believed that his uncle did have a garden east of the of the garage at one time. Steven stated that he was also unsure of when the pine trees were taken down and where the boundary rock was in comparison with the fence.

¶ 21    He was shown three pictures. As to the picture from 1973, Steven agreed that there was a straight line going down from the top of the picture along his uncle's garage and down to Mahomet Road. He agreed the same line was also seen in the aerial photograph from 2002 except for the angle east where his uncle's driveway and overgrown vegetation were located. He reviewed the survey obtained by his uncle in 2018 and agreed that the line was no longer a 90-degree angle.

¶ 22    On redirect, Steven was provided the same exhibits and then stated he was unsure of what line the previous attorney was talking about when he was questioned about the property line. He stated he was unaware of any line that marked the property. He testified that the line east of the Woodfield West survey line was where he believed his uncle's property ended.

¶ 23    Linda Richardson, Mr. Poll's daughter, testified that she lived in the house from 1971 to 1978. At that time, there was a split rail fence that went down one side, some trees, and an empty field covered in weeds up to her ankles on the east side. She stated there was also an area where you could park beside the garage. She stated that she did not recall Mr. Hansen showing where the property lines were. She then testified that she did remember Mr. Hansen showing them a big rock and where the property lines were. She recalled the pine trees to the east and stated her father took care of the property on the east by regularly mowing the yard, trimming the trees, raking leaves, moving sticks, and pulling weeds. She stated there was a gravel driveway that led up to the garage and there was a spot on the other side where they parked the other car. It had gravel and grass. She agreed the driveway was wider than the garage and stated that usually a car or a boat was parked

9

on the east side. She thought the old fence was a couple of feet from the rock. She stated that her mother planted flowers every year all over the property and also had a garden on the east side of the garage. However, it did not do very well and got moved to the back of the property. Linda stated that the new well was close to the garage, and she did not remember exactly where it was. She was unsure when the house next door was built but stated it was "quite a while after they moved in."

¶ 24    On cross-examination, Linda agreed that her father's memory was not very good anymore. She stated there were four sections of fence running along the driveway and then it went down Mahomet Road. She was unsure if there were four but knew there was more than one. She did not remember any pine trees in the field. She did not know who planted the pine trees. She stated the rock was on the outside of the fence further away from the driveway, a couple of feet over from the disputed driveway. She looked at a photograph and stated she could not see the rock in the picture. She was then impeached with her prior testimony regarding that photograph which stated the fence was even with the rock. On recross, Linda stated that a portion of the north/south fence could be seen behind her father in the picture.

¶ 25    Thereafter, Mr. Poll's attorney called Mr. Williams as an adverse witness. Mr. Williams confirmed that his property abutted that of Mr. Poll. He identified the warranty deed for his purchase of the home on April 14, 1999.

¶ 26    On March 16, 2023, Wesley Meyers testified that he was a licensed professional land surveyor who performed the 2018 boundary survey for Mr. Poll. He reviewed the deeds, the 2013 surveys that were performed, and the subdivision plats for all the surrounding areas. Thereafter, he commenced looking for evidence of the existing survey monuments comprised of iron pins and pipes delineating the corners of the property. Mr. Poll also showed him where he believed his

property ended by showing him a small boulder embedded in the ground that lay in a row of bushes adjoining the east side of his driveway. Mr. Poll advised him that Mr. Hansen told him this was the boundary line. From there, Mr. Poll walked north to the common line between Lots 22 and 23 of Woodfield Estates and pointed on the ground to a position that he claimed as his own and then walked farther north across another lot and pointed to a position on the ground that he claimed was his own between Lots 22 and 21. Mr. Meyers testified that he put three iron rods in the ground. One was south of the rock. The second was on the common line between Lots 22 and 23. The third was put between Lots 22 and 21. Mr. Meyers confirmed that he was aware that Mr. Poll was showing him where he believed the occupation line was and stated Mr. Poll seemed clear and definite about what he was showing him.

¶ 27    On cross-examination, Mr. Meyers again confirmed that he only knew where to draw the line on the survey because Mr. Poll told him where to put the line. He agreed there were no deeds or written descriptions with those boundaries. He agreed that the only other line was the Woodfield West survey line and confirmed that Mr. Poll's line was not consistent with that line. He reviewed the subdivision plat for the property east of Mr. Poll's property and confirmed that the line shown on the plat was the line closest to Mr. Poll's garage on his survey. He agreed the Williamses were the owners of the property in parcel 23 and that the line closest to Mr. Poll's garage was the line to which Mr. and Mrs. Williams held legal title. He stated that he did not observe a fence during his survey. He agreed that Mr. Poll's 2013 survey did not show either parcel marked on the 2018 survey.

¶ 28    Mr. Meyers testified that he worked with Edwin Hansen when he was subdividing the remainder of the lot around Mr. Poll's property. He confirmed that Mr. Hansen did not give any indication that the parcels marked on the 2018 survey existed when they were subdividing the lot.

He agreed that he set the original pin for Mr. Poll's property in 1991 at Mr. Hansen's directive. He further agreed that he set a pin three feet east at Mr. Poll's direction in 2018. He agreed that Mr. Hansen never mentioned to him that there was a three-foot discrepancy. The 1991 pin was consistent with the line that went all the way up to the river and the pin Mr. Poll directed him to set was not. Following Mr. Meyers's testimony, the plaintiff rested.

¶ 29    Thereafter, the Williamses began their case-in-chief. Mary Jones testified that she was the previous owner of the property currently owned by the Williamses. Mrs. Jones lived there from 1987 to 1999. Her neighbor to the left (west) was Mr. Poll. She did not remember anything about the boundary lines to the property. She reviewed the landscaping plan and remembered putting three trees in the front yard and one in the back that they received from friends. She did not remember planting pine trees in the backyard and did not remember if Mr. Poll had a garden.

¶ 30    Deborah Williams testified that she and her husband currently owned the property at 400 Deer Run Road, also known as Lot 23 in the Woodfield West Subdivision. Mr. Poll was her neighbor to the west. She testified that they used the entirety of their property and, prior to the events giving rise to the case, no one ever said anything to her about their use of the property. When they bought the property, there were pine trees on the western and southern borders of the property. The previous owners (Mr. and Mrs. Jones) left the landscape drawing and house blueprints. She identified the landscaping plan and stated approximately 80% of the landscaping was complete when they purchased the property. Shrubs and trees were at the top of the landscaping plan. The landscaping plan also included nine Austrian pines, some of which had been planted in the back (west side) of the house. Based on the landscaping map, she believed the pines were hers. Mrs. Williams testified that she put compost under the pines and explained how they made the compost and why they used it. She stated it would have been obvious that something was

placed there. She said the pines were not a lot of effort, that only required trimming dead branches. The pine trees lived longer than their lifespan and that was part of the reason they used compost at the bottom so that when they came down the soil would not be as acidic. She estimated the trees as having a four-foot radius. She and her husband hired someone to take down the trees sometime prior to 2009. They took one or two down at a time as they died to prevent the trees from falling over because they had children and did not want an accident. Removing the trees took more than a year and she and her husband paid for it. She never discussed it with Mr. Poll, and she did not recall him saying anything to them when they came down and never offered to help with the cost of their removal.

¶ 31    Mrs. Williams confirmed that they had a survey performed in 2013. She was retired at the time and planned to do food preservation. Therefore, she wanted to expand the garden and use as much of her land as she could, particularly north of where the pines were so they could have good soil to plant a garden. In the 24 years that she owned her home, she never saw Mr. Poll perform any work or take care of her property. He trimmed trees in his own backyard. She never saw him trim the pine trees. She did see him mow the lawn, but never saw him mow the lawn on her property. She explained that there was nothing to mow when the pine trees were there. Mr. Poll might have run his mower on the side of the garage to access his backyard but never mowed the grass east of his garage.

¶ 32    Mrs. Williams stated that the vegetable and herb gardens were a continuation of the landscaping line similar to the where the shrubs were on the landscape drawing. She never saw a garden on Mr. Poll's property. She would occasionally see a car parked on the east side of Mr. Poll's driveway, but it was usually the car of the neighbor across Mahomet Road. That neighbor would ask her if it was ok to park there if he needed extra space for guests. Mr. Poll's boat would

13

either be in front of his house or on the west side of the driveway. Mrs. Williams's garden included raspberry bushes.

¶ 33     On cross-examination, Mrs. Williams testified that they would occasionally use the driveway at the rear of the property for their own cars when guests came over. She agreed there were pine trees north of the driveway at one point. She understood that Mr. Poll was claiming a line further east of the line found in their survey. As to the landscape drawing, Mrs. Williams clarified that the darker lines shown thereon were the boundary lines. Not all of the pine trees shown thereon were planted when they moved in. A few were placed on the southern end but there were none on the northern end. She agreed the trees were approximately 15 feet in from Mr. Poll's actual property line. Those were the trees taken down in 2009. Mrs. Williams stated that the raspberry bushes were in the northwest corner of their property in line with the north/south line. She stated that her husband planted the raspberry bushes, and they picked the raspberries from them for years. She stated they were north and approximately three feet west of the pine trees. She did not know if Mr. Poll trimmed the raspberry bushes, but she knew someone trimmed them because the cut off branches were lying to the west of her black raspberry bushes. Neither she, nor her husband, trimmed the raspberry bushes. Mrs. Williams disagreed that she never went to the west side of her yard prior to obtaining the survey in 2013, stating that she put compost under the pine trees for several years.

¶ 34     Mr. Williams testified that he lived with his wife at 400 Deer Run Drive. He stated there were pine trees on the south and west side of the home when he purchased the property. He agreed that his wife regularly put compost under the pine trees. He agreed they had a survey performed in 2013. He was unsure if any pins were placed during the survey. He thought a stake was placed in one area and the top of a pin was painted in another area. Mr. Williams testified that he spoke

14

with Mr. Poll after the survey was completed. They talked at the stake in the northwest corner of the Williams' property. Mr. Poll asked him what the stake was, and Mr. Williams advised him that it was the property line. He explained that they had the property surveyed and that spot, along with the spot on the driveway, was the property line. Mr. Poll did not ask for a copy of the survey. Mr. Williams testified that he saw Mr. Poll come to their property where the berries were, and some had been cut. He stated that Mr. Poll did not take care of his property. He never saw Mr. Poll trim trees anywhere, either on his own or their property. He only saw Mr. Poll mow the grass north of the garage area. There was nothing to mow on the east side of Mr. Poll's garage. He never saw Mr. Poll weed whack either his own or the Williamses' property. He was aware that Mr. Poll obtained a survey in 2018 and some of the survey pins were in Mr. Williams's yard.

¶ 35    On cross-examination, Mr. Williams stated that Mr. Poll never alleged that any portion of the disputed property belonged to him. He never spoke with Mr. Poll about the property line until after the 2013 survey was obtained. They obtained the survey in 2013 so they could plant a garden and some berries. He stated there was no marker on the north side of the property, so they obtained a survey. The pine trees that were removed were approximately 20 feet tall and had a six-foot radius. He noticed the Poll driveway when they cut down the trees. Occasionally, there would be vehicles placed on the driveway. On redirect he confirmed that Mr. Poll's driveway moved farther east when the pine trees were removed. Mr. Williams also confirmed that his children used Mr. Poll's driveway.

¶ 36    Defendants next called Mr. Poll back to the stand. He stated that he had a survey taken in the 1970s but then said he did not. He could not remember if he had a survey taken when the Woodfield West Subdivision was subdivided. He confirmed his signature on an affidavit he provided in the case. At that time, he stated that the fencepost was not part of the property line. He

15

stated that all he did in the disputed area was mow the grass. He agreed that numerous people he wanted to call as witnesses had passed away. He further agreed that he never discussed the boundaries with anyone. He addressed photographs that were provided in discovery that revealed his driveway was west of the fencepost. He could not point out his driveway in the second picture.

¶ 37 Defendants recalled Steven Poll to testify. He could not recognize his uncle's driveway in the second picture and could not say for sure if the fence behind the area had two sections or one.

¶ 38 Defendants called Kyle Schultze, a professional land surveyor, to testify. He conducted a survey on behalf of defendants. He confirmed that Mr. Meyers's 2018 survey was not on file with the recorder's office. He also confirmed that Parcel 1 on the 2018 survey lay within Lot 23 of the Woodfield West Subdivision. There was no document on file with the recorder that showed the existence of Parcel 1. The Woodfield West Subdivision Owner's Certificate and Dedication document accurately represented the westernmost line of the subdivision, and that line was also the closest line to Mr. Poll's garage on Mr. Meyers's 2018 survey. He confirmed that Mr. Meyers put pins in the ground when he performed the 2018 survey. There were no other pins on the easternmost boundary of Parcel 1. He also reviewed GPS maps over time and noticed that Mr. Poll's driveway was just a single car-width for a number of years. Additional gravel was added to the east side and then, years later, asphalt was placed in front of the garage, and then a number of years after that, additional asphalt was placed on the gravel section to the east. Defendants rested.

¶ 39 Plaintiff called Mr. Poll for rebuttal testimony. He agreed that the neighbors across the street would occasionally park in his driveway and stated they asked for his permission. He agreed that the original driveway was gravel and was later paved in 2005 and 2006. He stated there was never a change in the size of the driveway while he lived there. When he asphalted the driveway the asphalt went where the gravel was. His wife's car, occasionally his, and some of their friends

16

would use the driveway. He never asked for permission to use the driveway. He owned it. He never received any complaints from anybody about his use or his family's use of the driveway.

¶ 40 Closing arguments were provided. Mr. Poll argued that he adversely possessed the property prior to the Williamses' purchase. The Williamses argued that was incorrect because a fence came down around 1985, trees were planted in 1987, compost was placed around the trees in 1999, the trees came down before 2009, the Poll driveway could not have been widened when the pine trees were present, and all of the landscaping was done by the homeowners of 400 Deer Run from 1987 to the present. As to the wellhead, the Williamses argued that it was only 9 to 12 inches tall and one foot wide, so it was difficult to see and therefore was not open and notorious. They conceded that if the well was classified as open and notorious, then the small area around the well should be given to Mr. Poll but not all of Parcel 1.

¶ 41 Following a recess, the court announced its ruling. The court first noted that the elements of adverse possession in Illinois were not in dispute. The court also noted that there was "a great deal of evidence in the case" that was "actually not in dispute." This included the following facts: Mr. Poll began residing on the property in the early 1970s and took ownership of the land in 1979. The court therefore deduced that "20 years had run by the time the Williamses bought their parcel from Ms. Jones." The court also found Mrs. Jones's testimony—that she never had a boundary dispute with the Polls—was relevant as was the evidence revealing that Mr. Poll's use of the land decreased as it moved farther away from the record boundary line. The latter was relevant because Mr. Poll had the burden in the quiet title action to show he possessed the property to a definite boundary by clear and convincing evidence meeting all of the elements of adverse possession for the entirety of the 20-year period.

¶ 42    The court stated that Mr. Poll was "absolutely correct" in stating the 20-year mark predated by one month the Williamses' purchase of the home, but stated the Williamses' testimony regarding their use, as opposed to Mr. Poll's use, of the property revealed that Mr. Poll was not doing anything with the property. The court found that the Williamses' testimony clarified some of Mr. Poll's claims. For example, there was a mystery as to why the Williamses would remove the pine trees; however, the Williamses' testimony revealed the trees got sick and were removed as they died. The Williamses also provided evidence as to how the trees got on the property in the first place. The court found some "limited adverse possession *** although not to the extent claimed by Mr. Poll."

¶ 43    The court found the strongest claim of adverse possession was the wellhead. Therefore, the court made the well the easternmost marker of Mr. Poll's property and then took that spot directly south to a portion of Mr. Poll's driveway and said that adverse possession of that rectangle was proven, but the remainder of the disputed property was not. The court specifically found that the driveway changed shape over time as shown in the pictures. The testimony also revealed a lack of exclusive possession of the driveway by Mr. Poll as evidenced by the Williamses using the driveway. The court also noted the lack of testimony as to Mr. Poll's use of the property to the line he claimed as well as the *laches* claim and stated that "had we been in court in the late 1990s or early 2000s, his memory might have been better, but his memory, manner while testifying on the stand seemed confused and uncertain to me at times, and I think the court draws some adverse credibility inferences about how he used property, especially with respect to the east of the wellhead line." The court found that prejudice from *laches* was shown, but worked against Mr. Poll equally, if not more than it worked against the Williamses, but was insufficient to bar the claim. The court ordered the Williamses' attorney to prepare an order.

¶ 44 The written order was issued on April 4, 2023. The order found Mr. Poll proved a limited adverse possession claim as to the well and the area south and west of a line that went from the southeast corner of his garage to the east edge of the well and from the east edge of the well south to S. Mahomet Road. However, as to the eastern portion of the driveway, no adverse possession was shown and therefore the order denied Mr. Poll's claim of trespass. The court ordered Mr. Poll to remove any portions of the driveway that were east of the line running directly south of the wellhead. The remainder of the disputed property was deemed the property of the Williamses. Mr. Poll timely appealed.

¶ 45                                      II. ANALYSIS

¶ 46 On appeal, Mr. Poll contends that the trial court's conclusion that he failed to prove adverse possession as to the land north and east of the garage was against the manifest weight of the evidence. In support, he contends that he had exclusive management and control of the disputed property for sufficient time for adverse possession to vest and the Williamses' actions were irrelevant because adverse possession vested prior to the ownership. In support, Mr. Poll relies on *Davis v. Haines*, 349 Ill. 622 (1932), and *Schertz v. Rundles*, 48 Ill. App. 3d 672 (1977), stating that no event interrupted the term of his adverse possession and therefore, the trial court's order was against the manifest weight of the evidence. Mr. and Mrs. Williams argue that Mr. Poll's argument failed to address the trial court's credibility rulings as well as its findings related to the evidence that found Mr. Poll did not continuously possess the area north and east of the wellhead.

¶ 47 We review the trial court's decision to determine whether the court's findings regarding the elements of adverse possession were against the manifest weight of the evidence. *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 38. " 'A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be

19

unreasonable, arbitrary, or not based on the evidence.' " *Id.* (quoting *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70).

¶ 48    A party claiming ownership by adverse possession must prove the following five elements existed concurrently for 20 years: "(1) continuous, (2) hostile or adverse, (3) actual, (4) open, notorious, and exclusive possession of the premises, (5) under claim of title inconsistent with the true owner." *Joiner v. Janssen*, 85 Ill. 2d 74, 81 (1981); see also 735 ILCS 5/13-101 (West 2022). "All presumptions are in favor of the title owner, and the party claiming title by adverse possession must prove each element by clear and unequivocal evidence." *Knauf v. Ryan*, 338 Ill. App. 3d 265, 269 (2003). Here, it was undisputed that Mr. and Mrs. Williams were the legal titleholders of the disputed parcel. Therefore, the burden of proof was on Mr. Poll to prove the five elements required for adverse possession.

¶ 49    As to elements for adverse possession, the courts have either defined the terms or provided examples of the elements. Continuous means uninterrupted and includes the actions of prior users from whom the adverse possession was derived. *O'Connell v. Chicago Park District*, 376 Ill. 550, 559 (1941) ("The doctrine that adverse possession of successive holders of lands may be tacked in determining the period of limitations is familiar."); *Applebey v. Lenschow*, 144 Ill. App. 3d 208, 215 (1986) (" 'Tacking' *** permits an adverse claimant to also rely upon the adverse possession of his predecessor in title."). "The 'hostility' element of adverse possession 'does not imply actual ill will, but only the assertion of ownership incompatible with that of the true owner and all others.' " *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 42 (quoting *Joiner*, 85 Ill. 2d at 81). Typically, hostility is established by evidence of the use and control over land as well as any improvement on the land. *Joiner*, 85 Ill. 2d at 82. "[A]ctions, not intentions or subjective beliefs, determine hostility." *Dai v. Minchella & Associates, Ltd.*, 2023 IL App (2d) 220411-U, ¶ 25.

20

Hostility requires the party claiming adverse possession to exercise ownership-like powers over it during the statutory period. Compare *Hermes v. Fischer*, 226 Ill. App. 3d 820, 827 (1992) (finding hostility where land was cultivated) and *Township of Jubilee v. State*, 405 Ill. App. 3d 489, 498 (2010) (finding that merely mowing the grass was insufficient to show hostility). The claimant must actually use and/or occupy the land in question. *Hermes*, 226 Ill. App. 3d at 827; *Arbogast v. Schaub*, 2021 IL App (3d) 200235-U, ¶ 27.

¶ 50     The element of open, notorious, and exclusive has also been explained. See *Joiner*, 85 Ill. 2d at 82-83. Acts of dominion or improvements on the land " 'indicate to persons residing in the immediate neighborhood who has the exclusive management and control of the land.' " *Id.* (quoting *Augustus v. Lydig*, 353 Ill. 215, 221-22 (1933)). "[T]he test for open and notorious possession is whether the community is *or could be apprised* of the claimant's possession and exclusive use and enjoyment." (Emphasis in original.) *Knauf*, 338 Ill. App. 3d at 271. The final element requires evidence that the adverse possessor performed the aforementioned elements "under claim of title inconsistent with that of the true owner." *Joiner*, 85 Ill. 2d at 81.

¶ 51     The trial court found that based on Mr. Poll's purchase of the property in 1979, Mr. Poll was "absolutely correct" in stating that the 20-year period required for adverse possession predated the Williamses' purchase of the home. Although this finding was not raised by Mr. Poll on appeal, and no cross-appeal was filed, due to Mr. Poll's reliance on this finding with the issue that was raised, the trial court's finding must be addressed. The undisputed evidence revealed that the disputed parcel was a pasture both prior to and after Mr. Poll purchased his property in 1979. Testimony by Mr. Poll, his daughter Linda, and his nephew Steven confirmed there were no neighbors east of Mr. Poll's property and the pasture was overrun with tall grass and weeds.

21

¶ 52    Nothing in the record contains evidence as to the true owner of the disputed parcel prior to the Joneses' purchase in 1987. Further the record contains no evidence as to whether any actions taken by Mr. Poll during the period from 1979 to 1987 on the disputed parcel were hostile or adverse to the actual titleholder, or even if the titleholder was aware of Mr. Poll's actions. The 20-year period for adverse possession does not start running "until the titleholder has a visible, objective reason to know that someone is trespassing." *McNeil v. Ketchens*, 397 Ill. App. 3d 375, 393 (2010). "The period cannot run on the sly." *Id.*

¶ 53    Based on the Woodfield West Subdivision Owner's Certificate and Dedication, the disputed parcel—which was included in the 92 acres dedicated to the Woodfield West Subdivision—was owned by Jacob and Melissa Chambers until October 10, 1978, at which time the land was dedicated to the subdivision. Mr. Poll presented no evidence establishing who was the actual titleholder of the disputed parcel for the period from 1979 to 1987. Without establishing the titleholder for the period from 1979 to 1987 and presenting no evidence as to Mr. Poll's relationship with the titleholder, no court can determine if Mr. Poll's use of the disputed property was hostile or done with the permission of the titleholder. As noted above, presumptions run in favor of the titleholder. *Joiner*, 85 Ill. 2d at 81. Therefore, this court is obligated to presume that any action Mr. Poll took with regard to the disputed parcel from 1979 to 1987 was done with the permission of the titleholder for that period.

¶ 54    Due to Mr. Poll's failure to submit any evidence regarding the record titleholder for the property from 1979 to 1987, we hold, as a matter of law, that the trial court's finding that Mr. Poll's adverse possession claim began in 1979 was against the manifest weight of the evidence.[2]

_____

[2]No cross-appeal regarding the trial court's award of the well was filed. Accordingly, this court will neither address nor disturb the trial court's award of the well property to Mr. Poll.

This holding, however, merely addresses Mr. Poll's argument that he had already obtained adverse possession of the subject property prior to the Williamses' purchase in 1999.

¶ 55    The issue raised on appeal related solely to the trial court's denial of Mr. Poll's request for a finding of adverse possession related to the property east and north of the well. While Mr. Poll requests this court vacate the trial court's decision, no part of Mr. Poll's argument addresses the trial court's findings related to the denial of this portion of his claim. As noted above, we will not disturb the trial court's finding unless they are against the manifest weight of the evidence. *Knauf*, 338 Ill. App. 3d at 269.

¶ 56    Here, the trial court specifically found that Mr. Poll failed to prove adverse possession related to the area north and east of the well. In making this determination, the trial court found that Mr. Poll's driveway changed shape over time. This finding is supported by the pictures showing the continual widening of Mr. Poll's driveway, as well as the testimony revealing that Mr. Poll's driveway could not have been as wide as its current depiction when the pine trees were still on the property. The court also found that Mr. Poll failed to establish exclusive possession of that area since the Williamses also used the driveway. This finding is supported by the testimony of both Mr. and Mrs. Williams. The trial court also noted the lack of clarity seen in Mr. Poll's testimony related to any actions he may have taken regarding that property. This finding is supported by the record revealing repeated impeachment of his hearing testimony with his deposition testimony. The record also revealed that although Mr. Poll did not have any idea when the pine trees were planted, or who planted the pine trees, the pine trees were part of the landscaping plans when the Joneses purchased Lot 23 and built their home. Mrs. Williams testified about the amount of landscaping completed when they purchased the home in 1999. While there

was conflicting testimony as to what, if any, portion of the disputed parcel Mr. Poll may have mowed, the trial court specifically found that Mr. Poll's testimony was not credible.

¶ 57 On review, we defer to the trial court's credibility findings as it was in the best position to make those determinations. *Cook v. AAA Life Insurance Co.*, 2014 IL App (1st) 123700, ¶ 51. Our review of the record fails to reveal that the opposite conclusion is clearly apparent, or that the trial court's findings were unreasonable, arbitrary, or not based on the evidence. Accordingly, we cannot find that the trial court's order denying Mr. Poll's claim of adverse possession for the property beyond the well and trespass regarding the same parcel was against the manifest weight of the evidence.

¶ 58                                      III. CONCLUSION

¶ 59 For the foregoing reasons, we affirm the trial court's April 4, 2023, judgment.


¶ 60 Affirmed.